**Dr. Calvin KOBLUK, Respondent,**

v.

**UNIVERSITY OF MINNESOTA, petitioner, Appellant.**

No. C4–96–1389.

Supreme Court of Minnesota.

Jan. 28, 1998.

Robert J. Hennessey, Ansis V. Viksnins, Lindquist & Vennum, P.L.L.P., Minneapolis, for appellant.

Mark B. Rotenberg, General Counsel, Univ. of Minnesota, Tracy M. Smith, Associate General Counsel, Minneapolis, for respondent.

Michael J. Ford, William V. Faerber, Quinlivan, Sherwood, Spellacy & Tarvestad, P.A., St. Cloud, for amicus curiae Minnesota Defense Lawyers Association.

## OPINION

TOMLJANOVICH, Justice.

This case presents the issue of whether the attorney-client privilege may attach to preliminary drafts of a document, exchanged between a client and a lawyer, when the final version is published to a third party. Pursuant to the Minnesota Government Data Practices Act, an assistant professor at the University of Minnesota sought to obtain two earlier drafts of a letter in which the university conveyed its decision to deny him tenure. On cross-motions for summary judgment, the

district court held that the attorney-client privilege shielded the first draft from production, but not the second. The court of appeals affirmed with respect to the second draft, but it reversed and remanded as to the first draft. We reverse, concluding that both drafts are protected by the attorney-client privilege and thus exempt from production under the Data Practices Act.

The facts of this case are not disputed; hence, we review the matter de novo. *See A.J. Chromy Constr. Co. v. Commercial Mech. Servs., Inc.,* 260 N.W.2d 579, 582 (Minn.1977). Dr. Calvin Kobluk served as an assistant professor in the university's College of Veterinary Medicine. When Kobluk applied for tenure in 1993, the college's promotion and tenure committee supported his application, as did the college's faculty. The department chair and the college's dean also supported Kobluk's tenure bid but withdrew their support, apparently after two complaints of misconduct were lodged against him. Information regarding these complaints and an earlier allegation of misconduct was included in Kobluk's tenure file. In July 1994, a vice president denied Kobluk tenure on the basis of the alleged misconduct.

Kobluk appealed the denial of tenure to the university's senate judicial committee. The committee recommended that the tenure file be reviewed again, this time solely on the basis of academic and scholarly qualifications. In July 1995, the university's president affirmed many of the committee's recommendations and assigned a provost the task of evaluating the file anew. At that time, the provost was notified that an attorney from the university's office of general counsel would serve as his legal advisor in the matter.[1] The provost and counsel had at least a brief conversation about the matter shortly thereafter.

After reviewing the tenure file, the provost prepared a first draft of a letter denying tenure.[2] On September 5, 1995, he forwarded the draft to counsel for her review, along with a cover memorandum addressed to her and marked "CONFIDENTIAL DRAFT." According to the provost, he sent the first draft to counsel because he anticipated that the letter denying tenure would "becom[e] a legal document."

Counsel reviewed the memorandum and first draft, jotting suggested revisions in the margins. She and the provost then met to discuss the draft and its legal implications. On September 13, 1995, counsel sent a second draft of the letter to the provost. After making some changes to this second draft, the provost sent the third and final version of the letter to Kobluk on September 19, 1995. Kobluk does not assert that anyone outside the provost's and counsel's offices saw either of the first two drafts.

Kobluk again appealed the denial of tenure to the senate judicial committee. During this proceeding, Kobluk sought to discover the two drafts of the September 19 letter;[3] however, the committee ruled that the drafts were privileged.

Kobluk then requested copies of the drafts pursuant to the Minnesota Government Data Practices Act, Minn.Stat. ch. 13 (1996). In rejecting the request, the university claimed the documents were shielded by the attorney-client privilege and thus exempt from production under the Data Practices Act. *See* Minn.Stat. § 13.08, subd. 4 (1996).

On cross-motions for summary judgment, the district court held that the first draft and accompanying cover memorandum were privileged and exempt from disclosure; however,

---

**1.** As a matter of course, the university assigns attorneys from its office of general counsel to employment matters involving employees who are represented by counsel. Kobluk had been represented by counsel since the autumn of 1992, when he sought advice regarding the first allegation of misconduct.

**2.** The university's tenure regulations provide that "[t]he University may not act contrary to the recommendation of the academic unit which made the initial recommendation except for sub-

stantive reasons which must be stated in writing * * * to the faculty member * * * ." University of Minn. Regulation Concerning Faculty Tenure 7.63.

**3.** In his quest to obtain the drafts, Kobluk has argued that the drafts are relevant to his appeal because they may show whether the provost considered impermissible factors in making the tenure decision.

the district court found that no privilege attached to the second draft. According to the court, "a conversation between an attorney and client as to what information shall or shall not be conveyed to others is privileged." The court reasoned that the provost and counsel "underst[oo]d that the information communicated [in the second draft] was to be conveyed to others," but had no such understanding as to the first draft. Finally, the court denied both parties' motions for attorney fees.

The court of appeals affirmed the district court's decision as to the second draft but reversed and remanded as to the first draft. *See Kobluk v. University of Minn.*, 556 N.W.2d 573, 577–78 (Minn.App.1996). According to the court of appeals, the district court's findings were insufficient to support its conclusion that the first draft and accompanying memorandum were privileged. *Id.* at 578. The court of appeals also awarded attorney fees and costs on appeal to Kobluk. *See Kobluk v. University of Minn.*, No. C4–96–1389 (Minn.App.1997) (order granting attorney fees).

■ This court has described the attorney-client privilege by reference to its statutory formulation,[4] as well as Wigmore's classic explication:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 John Henry Wigmore, *Evidence* § 2292, at 554 (McNaughton rev.1961), *quoted in Brown v. Saint Paul City Ry. Co.*, 241 Minn. 15, 33, 62 N.W.2d 688, 700 (1954). "The

purpose of the privilege is to encourage the client to confide openly and fully in his attorney without fear that the communications will be divulged and to enable the attorney to act more effectively on behalf of his client." *National Texture Corp. v. Hymes,* 282 N.W.2d 890, 896 (Minn.1979).

■ The privilege, however, is not without limits. For example, courts have held that the privilege may not be used to shield communications regarding a future crime or fraud. *See, e.g., Kahl v. Minnesota Wood Specialty, Inc.,* 277 N.W.2d 395, 399 (Minn. 1979) (dictum); *Levin v. C.O.M.B. Co.,* 469 N.W.2d 512, 514–15 (Minn.App.), *pet. for rev. denied* (Minn. July 24, 1991). Likewise, no privilege attaches when a lawyer has acted as a "mere scrivener" in drafting a document, as opposed to an instance in which the lawyer's advice is sought as to the document's legal terms and effect. *See In re Arnold & McDowell,* 566 F.Supp. 752, 755 (D.Minn.1983); 8 Wigmore, *supra,* § 2297, at 569–72. And "as a barrier to testimonial disclosure, the privilege tends to suppress relevant facts and must be strictly construed." *Kahl,* 277 N.W.2d at 399. Thus, the party resisting disclosure bears the burden of presenting facts to establish the privilege's existence. *See Brown,* 241 Minn. at 34, 62 N.W.2d at 701; *see also, e.g., Muller v. Walt Disney Prods.,* 871 F.Supp. 678, 682 (S.D.N.Y.1994); *United States Postal Serv. v. Phelps Dodge Ref. Corp.,* 852 F.Supp. 156, 163 (E.D.N.Y. 1994).

The university and Kobluk agree that if the attorney-client privilege attaches to the preliminary drafts of the letter denying tenure, the drafts are exempt from disclosure under the Data Practices Act. *See* Minn.Stat. § 13.03, subd. 6 (1996).[5] However, Kobluk

---

**4.** By its express terms, the statutory attorney-client privilege pertains only to disclosures by lawyers: "An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the course of professional duty * * *, without the client's consent." Minn.Stat. § 595.02, subd. 1(b) (1996).

**5.** The university refused to produce the two drafts on the ground they were "not public"

under the Data Practices Act. These documents fall squarely within the statutory definition of "personnel data." *See* Minn.Stat. § 13.43, subd. 1 (1996) ("'[P]ersonnel data' means data on individuals collected because the individual is or was an employee of * * * a state agency * * * ."). While some basic personnel data—such as employees' names, job titles, and salaries—are public, *see id.* § 13.43, subd. 2, "[a]ll other personnel data is [*sic*] private data on individuals," *id.* subd. 4. *See also id.* § 13.02, subd. 8a (defining "not public data" to include private data).

contends that the first draft was marked "confidential" and routed to counsel simply to gain the protection of the privilege, and he argues that the two drafts represented a request for and provision of literary or personnel, rather than legal, advice. For its part, the university asserts that the drafts were created to facilitate the provost's request for, and counsel's provision of, legal advice and that both drafts were intended to remain confidential.

Thus, the issues presented by this appeal are: 1) whether the drafts of the letter denying tenure constituted "communications relating to th[e] purpose" of seeking or rendering legal advice; and 2) if so, whether they were communications "made in confidence." 8 Wigmore, *supra*, § 2292, at 554. In other words, we must decide whether preliminary versions of a document can "come into existence * * * by reason of" the attorney-client relationship, *Brown*, 241 Minn. at 33–34, 62 N.W.2d at 700, and if so, whether the communications can be "confidential" even though the final version is disclosed to a third party.

### I.

▆▆▆ In asserting that the provost routed the first draft to counsel merely to shield it from discovery, Kobluk correctly observes that an otherwise unprivileged, preexisting document does not become privileged upon delivery by the client to the attorney. *See, e.g., Fisher v. United States*, 425 U.S. 391, 402–04, 96 S.Ct. 1569, 1576–77, 48 L.Ed.2d 39 (1976); *Phelps Dodge*, 852 F.Supp. at 160; *Brown*, 241 Minn. at 33, 62 N.W.2d at 700. Similarly, a document is not cloaked with the privilege merely because it bears the label "privileged" or "confidential." *See, e.g., Harper v. Auto–Owners Ins. Co.*, 138 F.R.D. 655, 673 (S.D.Ind.1991).

The university cites section 13.30 of the Data Practices Act to justify its refusal to produce the drafts. *See* Minn.Stat. § 13.30 (1996)("[T]he * * * dissemination of data by an attorney acting in a professional capacity for * * * a state agency * * * shall be governed by statutes, rules, and professional standards concerning discovery, production of documents, * * * and professional responsibility * * * ."); *see also Kobluk*, 556 N.W.2d at 576 (citing Minn.Stat. § 13.30). However, section 13.30 merely defines the scope of a

▆▆▆ A distinction must be drawn, however, between documents that exist independently of the attorney-client relationship and those that "com[e] into existence * * * as a communication" between the client and the attorney:

Where the document already had an independent existence and the communication consists in bringing its contents to *the attorney's knowledge*, that *knowledge* is not to be disclosed by his [or her] testimony * * *. But the physical possession of the document is distinct from that knowledge, and to compel production of the document is not to compel the disclosure of the communication.

* * * Where the document is itself the client's written communication, *coming into existence merely as a communication to the attorney*, the situation is obviously different. This communication itself is not to be produced, whether it was made by the client by word of mouth or by writing. Since a document which is itself a communication is within the privilege, the test is whether the document first came into existence as a part of a communication to the attorney.

8 Wigmore, *supra*, § 2307, at 594. For example, tapes and computer diskettes containing a murder suspect's "thoughts on his defense" constituted attorney-client communications even though they were seized before delivery to the suspect's lawyer, because the materials had been prepared at the lawyer's behest. *In re Death of Van-Slooten*, 424 N.W.2d 576, 578–79 (Minn.App.) *pet. for rev. denied* (Minn. July 28, 1988).

▆▆▆ Whether a document embodies an attorney-client communication may not always be readily apparent. *See Brown*, 241 Minn. at 32–35, 62 N.W.2d at 700–01; *see*

government attorney's duties under the act, whereas section 13.03 makes clear that privileged, "not public" documents are exempt from disclosure under the act and provides courts with standards by which to decide whether particular documents should be released. Although not a critical issue in light of our holding, we note that the district court should have applied the balancing test of Minn.Stat. § 13.03, subd. 6, after determining that the second preliminary draft was not within the privilege.

*also American Standard Inc. v. Pfizer Inc.,* 828 F.2d 734, 746 (Fed.Cir.1987); *Simon v. G.D. Searle & Co.,* 816 F.2d 397, 403–04 (8th Cir.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987). Yet, we have no difficulty conceiving that a preliminary draft of a document can "com[e] into existence" as a communication between two parties, even though the final product is intended for a third party.[6] It has become commonplace in the business world, and perhaps particularly so in the legal profession, to use document drafts to facilitate discussion, thereby conserving time and money. *See, e.g., Rohm and Haas Co. v. Brotech Corp.,* 815 F.Supp. 793, 796 (D.Del.1993) (concluding that privilege applied to draft patent application and to the notes a lawyer had written on it, where an inventor sent the draft to the lawyer as a client, the lawyer "received and acted on [the draft] as a lawyer," and the draft related to information provided by the client to procure legal advice from the lawyer), *aff'd,* 19 F.3d 41 (Fed.Cir.1994). Thus, the specific form of a document may be relevant to deciding whether the document constitutes an attorney-client communication, but it is by no means determinative.

In this case, the district court reviewed the preliminary drafts of the letter denying tenure, and it found that the provost wrote and sent a document to counsel in one form and that she returned it in a different form. Notably, the district court characterized these exchanges as "a conversation between" the provost and the associate general. The facts support this characterization: (1) the first draft followed a preliminary conversation between the provost and counsel regarding the tenure matter; (2) the second

draft followed a meeting in which the two discussed the first draft; and (3) the two preliminary drafts were viewed only by the provost, counsel, and members of their respective staffs.

The question remains, however, as to whether the preliminary drafts can be construed as a request for, and the communication of, legal advice, in light of Kobluk's contention that counsel instead provided personnel or literary advice to the provost. Because the district court did not specifically find that the first draft was created for the purpose of seeking and conveying legal advice, the court of appeals remanded for additional findings. *See Kobluk,* 556 N.W.2d at 578.[7] The court of appeals was in error.

█ From the district court's characterization of the preliminary drafts as "communications between an attorney and client," one may fairly infer that the drafts constituted a request for, and the rendition of, legal advice. Furthermore,

> a matter committed to a professional legal adviser *is prima facie so committed for the sake of the legal advice* which may be more or less desirable for some aspect of the matter, and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice.

8 Wigmore, *supra,* § 2296, at 567.

This prima facie evidence is not overcome by Kobluk's mere assertion that counsel's advice to the provost was of a nonlegal character. Moreover, the record and the drafts negate this contention. First, the record shows that the university assigned an attorney to the matter solely because Kobluk was represented by counsel. Second, although

---

6. The court of appeals reasoned that "a document which would have been created regardless of the attorney-client relationship will not become privileged upon its delivery to an attorney." *Kobluk,* 556 N.W.2d at 577. We respectfully reject this interpretation of the facts. While the attorney-client privilege plainly would not shield from discovery any preliminary drafts created by the provost for his own use, the court should not speculate as to whether he would have produced any such drafts absent an attorney-client relationship. The only certainty is that he would have written *a* letter to Kobluk, in accordance with the university's tenure regulations. *See supra* note 2.

7. The court of appeals took the position that a court should first analyze the element of confidentiality, rather than the nature of the communication, when deciding whether a document is privileged. *See Kobluk,* 556 N.W.2d at 577–78. Because it held that the second draft was not kept "confidential," the court of appeals did not reach the issue of whether the draft constituted an attorney-client "communication." *See id.* at 577. As discussed in more depth below, we disagree with this approach; thus, our analysis concerns both drafts.

the provost had never before consulted an attorney with respect to a tenure decision, he departed from his usual practice in this case, explaining that he "wanted counsel's advice with regard to the structure and format of this document because [he] saw it as becoming a legal document." The provost's assertion is confirmed by the general tenor of the memorandum to counsel that accompanied the first draft. Third, the provost stated that his decision to deny Kobluk tenure did not change as a result of his interactions with counsel. Finally, and most important, a comparison of the preliminary drafts reveals the substance of the advice counsel provided to the provost—which, in turn, reveals the provost's implicit request—and the advice is unquestionably legal in nature.

Accordingly, we hold that as a matter of law, the two preliminary drafts of the letter "c[a]me into existence * * * by reason of" the attorney-client relationship, and they represent, respectively, a request for and the rendition of legal advice. *Brown,* 241 Minn. at 33, 62 N.W.2d at 700. Thus, the first and third prongs of the Wigmore test are satisfied. *See* 8 Wigmore, *supra,* § 2292, at 554.

## II.

■■■ In holding that the privilege attached to the first draft of the tenure letter but not the second, the district court reasoned that the provost and his counsel "underst[oo]d that the information communicated in [the second draft] was to be conveyed to others," but they had no such understanding as to the first draft. Thus, the district court based its ruling in this case on what it perceived to be the university's subjective intent to keep the drafts confidential. Remanding for additional findings as to the first draft, the court of appeals declared,

> [C]onfidentiality is not determined solely by the client and attorney's stated intent.

The factfinder must also consider the nature and form of the document and the circumstances of the exchange. Further, if that inquiry results in a finding of confidentiality, then the fact finder must address the purpose for creating the document.

*Kobluk,* 556 N.W.2d at 578.

Courts in other jurisdictions have differed as to whether the requisite confidentiality is present when the information communicated between client and attorney eventually will be disclosed to third parties.[8] The Second Circuit has expressed what is, in our view, the better line of reasoning:

> [I]t is important to bear in mind that the attorney-client privilege protects communications rather than information; the privilege does not impede disclosure of information except to the extent that * * * disclosure would reveal confidential communications. Thus, the fact that certain information in the documents might ultimately be disclosed * * * did not mean that the communications to [counsel] were foreclosed from protection by the privilege as a matter of law. Nor did the fact that certain information might later be disclosed to others create the factual inference that the communications were not intended to be confidential at the time they were made. * * * Confidentiality may also, of course, be waived; but we see no indication that a waiver has yet occurred.

*In re Grand Jury Subpoena Duces Tecum (Marc Rich),* 731 F.2d 1032, 1037 (2d. Cir. 1984) (citation omitted). Implicit in the Second Circuit's analysis is a distinction between the communication itself, which is privileged, and the facts communicated therein, which are not. *See, e.g., Upjohn Co. v. United States,* 449 U.S. 383, 395, 101 S.Ct. 677, 685, 66 L.Ed.2d 584 (1981); *Rhone–Poulenc Ror-*

---

8. *Compare In re Grand Jury Proceedings,* 727 F.2d 1352, 1358 (4th Cir.1984) (concluding that attorney could testify as to information given by clients to assist him in preparing prospectus; deciding that the requisite confidentiality was absent—even though prospectus was never issued—because information was meant to be published to others), *with In re Grand Jury Subpoena Duces Tecum (Marc Rich),* 731 F.2d 1032, 1037

(2d Cir.1984) (holding that documents relating to a client's request for tax advice were privileged, although some of the information therein ultimately would be published), *and Schenet v. Anderson,* 678 F.Supp. 1280, 1284 (E.D.Mich. 1988) (concluding that privilege attached to preliminary drafts of tender offer that were prepared by defendants' attorneys).

*er Inc. v. Home Indem. Co.,* 32 F.3d 851, 864 (3d Cir.1994) *Levin,* 469 N.W.2d at 516–17; *cf. Schenet v. Anderson,* 678 F.Supp. 1280, 1284 (E.D.Mich.1988) (denying motion to compel production of preliminary drafts but granting motion as to identities of the drafters); *Wenner v. Gulf Oil Corp.,* 264 N.W.2d 374, 378, 380 (Minn.1978) (finding that the trial court erred when it excluded as privileged a letter from the plaintiff's attorney to the defendant, since the "[p]laintiff clearly expected the[ ] facts [contained in the letter] to be communicated to defendant"). *But see, e.g., Phelps Dodge,* 852 F.Supp. at 162–63 (holding that a draft of a letter containing handwritten attorney notes was not privileged, because the letter actually sent to the third party incorporated the revisions suggested by the attorney).

A client should not be foreclosed from having counsel review a preliminary draft of a document and provide legal advice via another draft, when the drafts are created to facilitate the efficient and complete exchange of information between lawyer and client and when the drafts are kept strictly private. *See, e.g., Amoss v. University of Wash.,* 40 Wash.App. 666, 700 P.2d 350, 362–63 (1985) (affirming conclusion that memoranda analyzing legal implications of tenure decision, prepared and conveyed in confidence by counsel to university president and board of regents, were privileged; noting that the professor had access to all the facts in the memoranda). *But see, e.g., Kobluk,* 556 N.W.2d at 577 (concluding that no privilege attaches to second draft because it is in the form of a letter to Kobluk) ("[T]he form and content of a communication may conclusively demonstrate the absence of confidential intent."). Otherwise, the client and lawyer might avoid drafts entirely, relying instead upon discussion to develop the details of the document. We see no reason to draw an illusory distinction between a face-to-face conversation and a non-oral exchange of essentially the same information. Such a holding would contravene the very essence of the privilege: to encourage the free flow of information between client and counsel, thereby promoting effective legal representation.

■ The court of appeals unnecessarily complicated the analysis in this case by conflating the elements of communication and confidentiality. *See Kobluk,* 556 N.W.2d at 578. Rather than addressing the element of confidentiality first, a court should decide, as a threshold matter, whether the contested document embodies a communication in which legal advice is sought or rendered. As explained above, "the nature and form of the document and the circumstances of the exchange," *id.,* unquestionably are relevant to the issue of whether a preliminary draft represents such a communication; hence, this inquiry will almost certainly involve examining other drafts in the series.

■ However, if that issue is resolved in the affirmative, a presumption of confidentiality arises as to that draft, evaporating only if "the client does not appear to have been desirous of secrecy." Wigmore, *supra,* § 2311, at 599 ("The privilege assumes * *. * that the communications are made with the intention of confidentiality."). Where confidentiality is disputed, a court need only ascertain whether the client intended to keep the specific draft confidential and whether the client and attorney took all steps reasonably necessary to prevent disclosure.[9] Other drafts in the series are irrelevant to this inquiry.

■ Under this analysis, the party who asserts that a preliminary draft is privileged retains the burden of proving the most difficult element: that the particular draft was created as an implicit request for, or as a means of rendering, legal advice. The party seeking production remains free to use all available methods of discovery to inquire into the facts conveyed in the communication.

---

9. While a party's subjective intent to maintain a document's secrecy is relevant, his or her conduct may be so objectively unreasonable as to negate the presumption of confidentiality (e.g., the client intends to have a private conversation with counsel but does so in a place where others are likely to overhear). The district court's memorandum was somewhat imprecise in this respect; however, the reasonableness of the university's efforts to keep the preliminary drafts confidential was not questioned in this case.

The district court reasoned (and the court of appeals agreed) that the second draft was not "confidential"—and, thus, not privileged—because it was intended to be disclosed to Kobluk. However, the record does not show that the provost and counsel agreed to send the second draft to Kobluk; rather, counsel merely sent the revision to the provost. Whereas the provost could just as well have made changes to the second draft and returned it to counsel for further review, he instead made changes and sent the third version to Kobluk.[10] No one other than the provost and counsel saw the second preliminary draft until it was produced to Kobluk, pursuant to the court of appeals' decision. As a matter of law, therefore, the provost and counsel maintained the confidentiality of the two preliminary drafts, and both drafts are privileged.

Accordingly, we reverse and remand to the district court for proceedings consistent with this decision. Because of our holding, we need not reach the issue of whether the district court properly denied Kobluk's request for attorney fees, and we vacate the court of appeals' order awarding attorney fees and costs on appeal to Kobluk.

PAGE, J., took no part in the consideration or decision of this case.

---

10. The district court's and court of appeals' opinions lead one to the inescapable conclusion that they viewed the second and final drafts of the letter denying tenure as one and the same document, perhaps because a comparison of those drafts does not implicitly reveal an attorney-client communication. However, the character of the changes between the second and final drafts is wholly irrelevant to the issue of whether the provost and counsel kept the second draft confidential.