STATE of Minnesota, Respondent,

v.

**Thomas Daniel RHODES, Appellant.**

No. C3–98–1839.

Supreme Court of Minnesota.

June 7, 2001.

Douglas W. Thomson, Melissa M. Fraser, Lisa Lodin Peralta, St. Paul, for appellant.

Michael Hatch, Minn. Atty. Gen, Thomas R. Ragatz, Asst. atty. Gen., St. Paul, Boyd Beccue, Kandiyohi County Atty., Willmar, for respondent.

## OPINION

BLATZ, Chief Justice.

This case comes before us on appeal from appellant Thomas Rhodes' conviction for the first- and second-degree murder of his wife and the postconviction court's subsequent denial of postconviction relief. Appellant argues that he received ineffective assistance of counsel at trial,[1] that the district court erroneously admitted certain prejudicial evidence, and that the district court improperly denied appellant's request for a new trial based on newly discovered evidence. Appellant further contends that the evidence was insufficient to support his conviction and that the postconviction court improperly denied his request for an evidentiary hearing and a new trial based on his ineffective assistance of counsel claim. We conclude that the district court did not err in admitting the disputed evidence, but remand for an evidentiary hearing on two of appellant's three postconviction ineffective assistance of counsel claims. Because we deem the record incomplete at this time, we decline to decide the other issues appellant has raised.

On the night of August 2, 1996, appellant and his wife Jane were vacationing with their two sons at the Northern Inn near Spicer, Minnesota. The inn is located at the southwest corner of Green Lake. Between approximately 11:15 and 11:30

---

1. Although appellant was represented by two attorneys at trial, we will refer to them collectively because appellant does not distinguish between them for purposes of his ineffective assistance of trial counsel claim.

p.m., the Rhodes left their sons in the inn room and drove the family jet boat onto the lake. Appellant told investigators that he drove the boat in a northerly direction from the dock by the inn, then stopped the boat and began watching the stars and "necking" with his wife.[2] At some point, he and Jane allegedly saw a boat with no lights driving wildly to their south. To escape the boat and "take a spin" before heading back, appellant drove further north at about 40 miles per hour.

As he was driving, appellant glanced to the left and saw Jane get up from her seat. She appeared to be looking for something, which appellant believed to be an earring. A clip-on earring was later found in the boat. Continuing north on the lake, appellant looked back again and "saw [Jane's] leg or her tennis shoes go over" the edge of the boat. It is undisputed that Jane was not wearing a life jacket and was not a good swimmer.

In a police interview 2 weeks after the drowning, authorities asked appellant what he did when Jane fell in the water. Appellant responded:

> I went to grab for the throttle and—and missed it the first time. And then I pulled it back, started to turn, and then accelerated and went right back to where I thought—thought she was, and I couldn't see her. I stood up on the—the—the deck. And she's not by any means a good swimmer, so I got in the water to see if I could rescue her, and I couldn't find her.

According to appellant, he then got back in the boat and began zigzagging toward the south, then back to the north, searching for his wife. Not finding her or getting any response when calling her name,

appellant drove toward shore. He parked his boat facing toward the lake, tied the boat to the dock, and grabbed a sweatshirt from the boat. Because Little Melvin's, a bar located in the building closest to the dock, appeared to be closing, appellant went back to the Northern Inn for help. However, the bouncer at Little Melvin's who saw appellant dock his boat and walk past Little Melvin's testified at trial that light was coming from the bar and a band was playing. In the bouncer's view, appellant did not seem agitated as he walked toward the inn.

At the inn, a desk clerk who described appellant as "emotionally distressed," incoherent, and "wet from head to toe," tried to understand appellant's story and eventually called 911. When Kandiyohi County Deputy Randall Kveene arrived, appellant told him, as he repeatedly told deputies in the following weeks, that he had been about 1,000 yards north of Little Melvin's when Jane went overboard. Despite this statement, appellant directed Kveene only 400–500 yards northeast of the dock after they boarded appellant's boat. When Kveene asked if the location was correct, appellant responded that the search should move a little farther north. Kveene and appellant searched the area within about 100 yards of the location appellant first identified until others joined the search 20 to 25 minutes later. At that time, another deputy asked appellant if they were in the right spot. After appellant responded affirmatively, the deputy marked a last-seen point.

After the unsuccessful search was called off for the night, appellant talked with Pastor Perry Wieland, a member of the local volunteer ambulance service who had been participating in the rescue efforts.

---

2. Although appellant did not testify at trial, much of his version of events was introduced through the testimony of other witnesses and the transcript of appellant's August 15, 1996 interview with law enforcement authorities.

Appellant's narrative to Wieland was consistent with what he had told law enforcement authorities, except Wieland believed that appellant said he was driving slowly, rather than quickly, when Jane went overboard.

The search resumed the next morning, August 3. Appellant again told the sheriff that the search party should move north. This time the search moved approximately 2,000–3,000 feet north. At about 1:00 p.m., fishermen found Jane's body in an area nine-tenths of a mile northwest of the last-seen point appellant had identified.

The recovery location was four-tenths of a mile or less from the locations where seven different shore witnesses had watched a person driving his boat in fast, erratic, figure-eight patterns at about the time Jane allegedly went overboard. Although none of the witnesses could identify the parties in the boat and five of the witnesses testified that they heard voices from the boat that sounded like people having fun, one of the witnesses heard a woman's voice say "Stop. No. It hurts." more than once. None of the witnesses recalled seeing more than one boat on the lake at the relevant times. Two witnesses identified the boat as a light-colored two-tone boat with an inboard motor, which matches the description of appellant's boat. Those two witnesses later saw a male driver circling the same boat, and one commented to the other that "[h]e acts like he's looking for something." After watching for a while, the two observed the boat head south down the shoreline at a slow pace.

To support a theory that appellant intentionally misdirected authorities so they would not discover Jane's body or any evidence that appellant intentionally drowned her, the state offered the testimony of Patrol Captain William Chandler of the Hennepin County Sheriff's Office.

Chandler found it improbable that a body could sink in Green Lake, resurface, and then float nine-tenths of a mile in thirteen hours. He also thought it unlikely that the body could have remained afloat without a life jacket or, even if it did, that trained observers would overlook a body floating on the water. Chandler therefore identified a point near the location where the shore witnesses watched a boat being driven erratically as the likely place Jane went overboard. In response to Chandler's testimony, Dale Morry, a boating accident reconstructionist and former state boating administrator, testified for the defense that a body floating just beneath the water's surface could easily elude searchers, especially if wind and wake action caused the body to float a long distance.

Some of the most critical evidence supporting the state's theory was testimony from medical experts indicating that Jane's death was not accidental. The first medical expert who examined Jane's body was Dr. Lyle Munneke, a Kandiyohi County medical examiner. Upon examination, Dr. Munneke noted that bruising covered Jane's forehead and nose, left and right sides of her face, and the underside of her hairline to the top of her head. Dr. Munneke also observed a cut on the right side of her mouth.

In addition to the injuries Dr. Munneke observed, Dr. Michael McGee, the forensic pathologist who performed the autopsy, found hemorrhaging beneath the facial injuries. Dr. McGee believed that these injuries occurred while Jane was alive, and used a life-sized clay model of Jane's head to demonstrate that "a single blow" probably did not cause the damage to both sides of Jane's face. Dr. McGee answered in the affirmative when asked whether multiple strikes from a boat hull—possibly appellant's—could have caused the injuries.

Dr. McGee also testified about Jane's other injuries. He stated that the laceration on the side of her mouth was premortem and could have occurred when a boat hit her mouth and stretched it to the point of tearing. Furthermore, he explained that postmortem abrasions on the backs of her hands and forehead may have been caused by her body sinking and scraping the bottom of the lake while floating face down.

Dr. McGee's testimony undercut appellant's theory that the drowning was accidental. Specifically, Dr. McGee noted paired injuries to the upper forearms that he classified as defensive wounds and soft tissue hemorrhages inside the neck region that did not have corresponding external marks. When asked about the neck trauma, Dr. McGee testified:

Q. Could that have been done by the hull of a boat?

A. I think not.

Q. Could that have been done with a hand, in particular a hand used thus in the V position?

A. I believe that is possible, yes.

Taken as a whole, Dr. McGee's testimony reinforced the state's theory that appellant forced his wife overboard. His testimony was also consistent with Chandler's testimony that because Jane's body resurfaced nine-tenths of a mile from the last-seen point, she probably sank to the lake bottom after drowning at a location different than appellant identified.

For the defense, Dr. Lindsey Thomas, an assistant coroner and assistant medical examiner, agreed that the head injuries were premortem. However, she testified that Jane's face had internal hemorrhaging on both sides because the blood from the forehead injury drained into her face, not because multiple blows followed the contour of her head as Dr. McGee suggested. Dr. Thomas also testified that a bruise on Jane's leg and the neck injuries were consistent with Jane hitting the side of the boat and water as she fell overboard. Lastly, Dr. Thomas stated that the forearm bruises were unlikely defensive wounds, but, like the forehead injury, may have been caused by bumping into the underside of the boat.

The state also sought to prove motive. The state first introduced evidence of an alleged extramarital affair in order to show that the Rhodes' marriage was unstable. Kathy Mason admitted to having a nonsexual relationship with appellant from approximately January to July of 1995, or about 1 year before Jane's death. Mason testified that she and appellant met once a week or three times a month and that she and appellant once went to a motel, where they hugged and kissed, talked, played cards, and drank champagne. Mason claimed that appellant ended the relationship in mid 1995 because he wanted to work on his marriage.

In addition, attorney C. Andrew Johnson testified that he met with appellant and Jane in May 1995 about a possible divorce, and that he calculated the amount of child support each spouse would have to pay the other if only one had custody of the children. Johnson testified that he told the Rhodes that appellant would have to pay $650 or $742 in child support out of his $2400 net monthly income. After this meeting, the Rhodes never again met with Johnson about a divorce.

Finally, a certified public accountant and director of investigations in the Minnesota Attorney General's Office testified regarding the Rhodes' recently increased debt accumulation and their newly acquired life insurance policies covering Jane's death. The accountant testified that the Rhodes' debt load nearly doubled between November 1995 and July 1996, largely because

the Rhodes bought a new house and upgraded their car and boat. He further testified that the Rhodes had $233,135 in life insurance payable in the event of Jane's accidental death. Of that total, approximately $102,000, which consisted of credit life insurance on the Rhodes' new mortgage, boat, and automobile, were purchased in the 4 months preceding Jane's death. On July 26, 1996, the Rhodes applied for $50,000 in additional term life insurance on Jane, but that policy never took effect because the insurance company received the application after her death. Taking all this evidence together, the state theorized that appellant planned his wife's death because he could not afford the divorce he desired and would obtain substantial insurance benefits if she died.

After a 12–day trial, the jury convicted appellant of murder in the first and second degree. Alleging insufficient evidence and newly discovered evidence, appellant brought a motion for a new trial. Appellant's newly discovered evidence claim was based on the affidavit of Brian Hunter, a guest at the Northern Inn on the night of August 2, 1996. In his affidavit, Hunter claimed that he was walking on the beach with his girlfriend when he observed a boat circling before approaching shore at a high rate of speed, and then saw appellant running from his boat to the inn. Hunter also stated that he and his girlfriend walked to the Northern Inn where, as they walked through the lobby, he saw appellant talking to the inn clerk in a "hysterical" manner that was hard to understand. He claimed that he learned the next day that a body had been found, but did not discover until a visit to the Northern Inn

nearly 2 years later that appellant had been charged with a crime.

In denying appellant's motion for a new trial, the district court concluded that Hunter's information was "inherently doubtful" because: (1) No trial testimony indicated the presence of other people while appellant was explaining his wife's disappearance to the Northern Inn clerk; (2) Hunter "never followed up as to the status of the overboard person"; (3) Hunter did not come forward with information the day after the drowning, even though a "command post" had been set up on the beach for this purpose; and (4) Hunter's recollection was dubious because 2 years had passed since he witnessed these events. The court also concluded that even if Hunter's testimony was credible, it was "not likely to produce a more favorable outcome" if a new trial was granted because the testimony "covers only the time where he allegedly viewed a boat driving on Green Lake until he saw Thomas Rhodes in the hotel lobby." Upon denial of his motion for a new trial, appellant filed a notice of appeal with our court, but moved for a stay of appeal and remand so he could bring a petition for postconviction relief. The motion was granted.

In his petition for postconviction relief, appellant argued that his attorney erred in failing to seek a change of venue.[3] In support of this claim, appellant pointed out that many of the potential jurors had heard something about an August 1996 drowning on Green Lake. Appended to his petition were numerous newspaper articles and transcripts of radio clips regarding the drowning and trial, as well as appellant's

---

**3.** In his postconviction petition, appellant claimed that false testimony by the state's medical expert, ineffective assistance of counsel, prosecutorial misconduct, and the erroneous admission of prejudicial evidence warranted an evidentiary hearing and ultimately

a new trial. In this direct and postconviction ·appeal, appellant's only postconviction claim is that he was entitled to an evidentiary hearing because he presented facts sufficient to show that his trial counsel was ineffective.

own affidavit stating that he had repeatedly asked his attorney to seek a change of venue. Appellant also submitted an affidavit from his mother, stating that appellant's attorney told her just before the jury's verdict was returned that "this was probably one of the rare cases in which he should have requested a change of venue."

Appellant also presented an affidavit and supporting medical articles from Dr. John Plunkett, a certified forensic pathologist, to show that Dr. McGee's testimony was "contrary to accepted medical authority." Appellant further argued that defense counsel's lack of cross-examination of Dr. McGee and failure to object to his "speculative" testimony constituted ineffective assistance of counsel.[4] First, contrary to Dr. McGee's affirmative response to the question whether Jane's neck injuries may have been caused by a hand in "the V position," Dr. Plunkett stated that "[t]he injuries to Jane Rhodes [sic] neck musculature probably occurred as a result of the hyperextension and overexertion of the neck muscles which occurs during the process of drowning and the struggle for survival." Dr. Plunkett further concluded:

> The injuries to Jane Rhodes' neck musculature may also be attributed to one or more of the following causes: hypostatic[5] change, post-mortem leakage of venous blood, post-mortem traumatization and breaking of the cadaveric rigidity during recovery or transport of the corpse, extravasation of blood into the tissue spaces as a result of the handling of organs and the incision of vessels during routine post-mortem examinations.

(Footnote added.)

Several law and medicine journal articles submitted to the postconviction court along with Dr. Plunkett's affidavit supported this conclusion. In one article studying cases involving hemorrhage to the neck musculature that, like Jane's, showed no obvious neck compression or trauma, the authors concluded that victims' efforts to save themselves may well result in such injuries and stated that "[i]n the absence of direct trauma to the neck, most cases of anterior neck hemorrhage appear to result from either hypostatic change" or dissection procedures. N. Carter et al., *Problems in the Interpretation of Hemorrhage Into Neck Musculature in Cases of Drowning*, 19(3) Am. J. of Forensic Med. & Pathology 223, 225 (1998).

Several other articles were submitted in support of the possibility that breaking rigor mortis during the recovery or transport of a corpse may cause hemorrhages in neck musculature. In one article, the authors concluded that such hemorrhage occurred in a case involving a suicide by drowning. Thomas Sigrist & Walter Rable, *Hemorrhages in Skeletal Muscle—Vital or Post Mortem?*, 3 Rechtsmedizin 94, 95 (1993).

Dr. Plunkett also concluded that the injuries to Jane's forearms and face, which Dr. McGee characterized as "defensive wounds" and the result of "multiple blows," respectively, were consistent with floating along the lake bottom face down. Although part of one of the articles attached to Dr. Plunkett's affidavit was produced by the prosecution in discovery, the defense never introduced at trial the portion of the article stating that injuries resulting from floating in this manner should not be confused with defensive wounds.

---

4. In a later brief to the postconviction court, appellant also alleged that trial counsel provided ineffective assistance in failing to object to the state's leading questions of Dr. McGee.

5. In lay terms, hypostasis is defined as "the settling of blood in the dependent parts of an organ or body." Merriam Webster's Collegiate Dictionary 572 (10th ed. 1996).

Finally, appellant resubmitted Brian Hunter's earlier affidavit in support of his claim that trial counsel was ineffective in failing to conduct an adequate pretrial investigation. Specifically, appellant argued that his counsel should have taken the reasonable steps of obtaining the list of guests registered at the Northern Inn on August 2 or 3, 1996, and contacting them. Appellant suggested that had this been done, counsel would have discovered that Hunter had relevant information rebutting the state's theory while supporting appellant's theory.

The postconviction court dismissed appellant's petition for postconviction relief without holding an evidentiary hearing.[6] In the memorandum accompanying its order for dismissal, the court concluded that appellant's complaints about trial counsel's failure to make evidentiary objections and seek a change of venue were matters of trial strategy. As to the venue claim, the court noted that it was "purely speculative" to say whether a jury in a different county might have reached a different result, especially when each member of the jury panel was carefully examined during voir dire. The court also noted that Dr. Plunkett's testimony would be "cumulative" to those opinions offered by Drs. McGee and Thomas and was not newly discovered evidence. Because Dr. Plunkett was a co-worker of the defense's medical expert, the court concluded that his opinions were discoverable at the time of trial. While the court did not separately address appellant's claim regarding his trial counsel's failure to investigate, it did state that the "advocacy demonstrated in this case on each side was vigorous, thorough, and effective."

Appellant subsequently brought a motion for reconsideration, claiming that the postconviction court's failure to conduct an evidentiary hearing on his ineffective assistance of counsel claim was erroneous. In support of this motion, appellant produced additional affidavits. First, appellant submitted a second affidavit from Hunter that supplemented his affidavit submitted in support of the motion for a new trial. For the first time, appellant also submitted a corroborating affidavit from Nichole Bauman, Hunter's girlfriend who accompanied him to the Northern Inn in August 1996. Lastly, appellant offered affidavits from two defense attorneys who supported appellant's ineffective assistance of counsel claim. One of the defense attorneys emphasized the importance of the Hunter and Bauman testimony:

> Their testimony * * * presented a stark alternative to the prosecution witnesses. Ms. Bauman and Mr. Hunter indicated they observed five or six boats on the lake during the critical time period, and also observed Mr. Rhodes come straight into the dock and run to the Northern Inn, where shortly thereafter they noticed him explaining that his wife had fallen in the lake. His emotion bordered on the hysterical, consistent with someone who has been in an accident and who has lost a loved one. This testimony would have countered * * * the State's theory that Mr. Rhodes remained rather clinical and abstract not only in his walk to the hotel but in his explanation of what occurred. The number of boats on Green Lake is also critical in that the testimony of the state's witnesses indicated a sole boat on what is a large lake, in the middle of the summer.

---

**6.** The same judge who presided over appellant's trial heard both his motion for a new trial and his petition for postconviction relief.

The testimony * * * would have also undercut the prosecution's main witness, and only witness, who said she heard a voice screaming, "Stop. No. It hurts."

In addition to recounting what they had witnessed, the Hunter and Bauman affidavits addressed the district court's question, raised in its memorandum denying the motion for a new trial, as to why Hunter did not come forward earlier. Both Hunter and Bauman stated that they thought the drowning was accidental and that they were unaware of the ensuing murder charges.

The expert defense attorneys' affidavits also supported appellant's claim that an objectively reasonable level of representation at trial would have involved the introduction of other, medically-sound explanations for the injuries Dr. McGee believed were the result of "blows." Among other things, one attorney expressly stated that trial counsel's failure to show through examination that Jane may have been injured in one of the many ways Dr. Plunkett's affidavit and supporting articles suggested constituted ineffective assistance of counsel. Without addressing the supplemental affidavits, the postconviction court summarily denied the motion to reconsider and appellant moved to reinstate his appeal.

## I.

Appellant first challenges five of the district court's evidentiary rulings. Specifically, he challenges the admission of two of the state's visual aids and the admission of testimony regarding appellant's alleged extramarital relationship with Kathy Mason and his conversations with Pastor Wieland and his attorney, C. Andrew Johnson.

■ A defendant claiming the district court erred in admitting evidence bears the burden of proving the admission was erroneous and prejudicial. *State v. Green-*

*leaf,* 591 N.W.2d 488, 504 (Minn.1999). Evidentiary rulings will not be reversed absent a clear abuse of discretion. *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989). At a minimum, evidence must be relevant to be admissible. *State v. Harris* 521 N.W.2d 348, 351 (Minn.1994). Relevant evidence may still be inadmissible if its probative value is substantially outweighed by its likelihood of creating prejudice. *Id.* at 352; Minn. R. Evid. 403.

■ First, appellant argues that admission of a clay model of Jane's head was unfairly prejudicial because it was life-sized, realistic, bruise-covered, and generally grotesque. However, "[t]he use of visual aids is an issue within the discretion of the trial court. Such aids are admissible if they will assist the jury in understanding the witness' testimony." *State v. Walen,* 563 N.W.2d 742, 748 (Minn.1997) (internal citations omitted). Here, the location of the injuries and whether they could have resulted from appellant's intentional violence were central issues in the case. The trial court, in its discretion, admitted the model solely for illustrative purposes so Dr. McGee could explain the injuries from a three-dimensional perspective, and cautioned the jury about the model's limited function. We cannot say this was an abuse of the trial court's broad discretion.

■ Appellant also argues that the daytime video of areas of Green Lake was irrelevant and misleading because it made locations on the lake clear to the jury though they were not clear to appellant when searching for his wife during the night. However, "[n]o event can be perfectly reenacted." *State v. Ritt,* 599 N.W.2d 802, 812 (Minn.1999). Moreover, it is not disputed that the evidence aided the jury in placing the location of the alleged crime in context. *See State v.*

*Friend,* 493 N.W.2d 540, 544 (Minn.1992). The locations and distances discussed in this case were relevant independent of appellant's observations on the night in question.

■ Third, appellant asserts that evidence of his relationship with Mason was irrelevant and more prejudicial than probative because the relationship ended more than a year before Jane's death. We have said that "[e]vidence that pertains to the relationship between a defendant and a homicide victim * * * is admissible in criminal prosecutions * * * for the purpose of showing motive and the history of the relationship with the victim * * *." *State v. Langley,* 354 N.W.2d 389, 397 (Minn.1984). Appellant's alleged affair with Mason is relevant to the status of appellant's relationship with his wife and was not so remote as to lack probative value regarding appellant's motive. Furthermore, Mason's explanation that appellant ended the relationship to work on his marriage minimized the testimony's prejudicial effect.

■ Fourth, appellant claims that the district court erroneously allowed Johnson to violate the attorney-client privilege by testifying about the meeting in which Johnson, appellant, and Jane discussed the financial aspects of divorce. The attorney-client privilege does not apply to confidences given in the presence of third parties. *See Kobluk v. Univ. of Minn.,* 574 N.W.2d 436, 443 (Minn.1998) (noting that disclosure to a third party may waive the confidentiality element of the attorney-client privilege). Although appellant argues that he and his wife were joint clients, Johnson testified and the district court determined that appellant alone was the client. Because Jane was a nonclient third party, her presence prevented the attorney-client privilege from attaching.

■ Finally, appellant argues that the district court erroneously allowed Pastor Wieland to testify about the conversation he had with appellant upon returning to shore with the volunteer ambulance team. The burden is on the party asserting the clergy privilege to show he was seeking spiritual aid in a confidential conversation when he spoke with a member of the clergy. *See State v. Lender,* 266 Minn. 561, 564, 124 N.W.2d 355, 358 (1963). The privilege does not apply where a member of the clergy receives nothing more than an ordinary description of the events. *State v. Black,* 291 N.W.2d 208, 216 (Minn. 1980).

In the instant case, the record does not conclusively show that appellant knew on the night in question that Wieland was a pastor. Although Wieland agreed that the conversation took place while Wieland "talked * * * as a pastor," and that appellant "fell on his hands and knees" during a separate conversation the next morning, these statements do not indicate that appellant fell on his knees in the religious sense or that he knew Wieland was speaking as a pastor.[7] Nor does the record show that appellant, standing in the lobby of the inn, gave Wieland anything more than a general description of the night's events. Thus, appellant has not satisfied his burden of proving that the conversation was both ministerial and confidential.

7. Appellant asserts for the first time in his pro se brief that Wieland gave him a business card before their conversation on the night of Jane's drowning, and that the card clearly indicated that Wieland was a Methodist minister. We cannot rely on this assertion, however, because it is not in the record. Further, as it is unrelated to appellant's postconviction claims, it will not become part of the record in the evidentiary hearing for which we remand this case.

Having considered the trial court's evidentiary rulings, we hold that the court did not abuse its discretion in admitting the clay model, lake video, and testimony regarding appellant's alleged relationship with Mason. Additionally, we hold that the court used proper discretion in concluding that the attorney-client privilege did not attach to the Rhodes' joint conversation with the attorney and that the clergy privilege did not attach to appellant's conversation with Wieland.

## II.

Appellant also claims that the postconviction court erred in denying his petition for postconviction relief without conducting an evidentiary hearing on his ineffective assistance of counsel claim. We review a postconviction proceeding to determine if there is sufficient evidence to sustain the postconviction court's findings, and we will not disturb the court's decision absent an abuse of discretion. *Scruggs v. State*, 484 N.W.2d 21, 25 (Minn.1992).

A postconviction court properly dismisses a petition for postconviction relief without conducting an evidentiary hearing when the petition and record "conclusively show that the petitioner is entitled to no relief." Minn.Stat. § 590.04, subd. 1 (2000). Conversely, an evidentiary hearing is necessary "whenever material facts are in dispute that * * * must be resolved in order to determine the issues raised on the merits." *Hodgson v. State*, 540 N.W.2d 515, 517 (Minn.1995). Thus, appellant must allege facts that would, if proven by a fair preponderance of the evidence, entitle him to relief. *Roby v. State*, 531 N.W.2d 482, 483 (Minn.1995). Any doubts as to whether to conduct an evidentiary hearing should be resolved in favor of the party requesting the hearing. *State ex rel. Roy v. Tahash*, 277 Minn. 238, 244, 152 N.W.2d 301, 305 (1967).

Appellant claims that his trial counsel was ineffective because counsel did not move for a change of venue, failed to properly counter Dr. McGee's testimony, and conducted an insufficient investigation that deprived appellant of relevant testimony from at least two potential defense witnesses. To prevail on an ineffective assistance of counsel claim, an appellant must show that trial counsel's representation "fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome would have been different but for counsel's errors." *State v. Lahue*, 585 N.W.2d 785, 789 (Minn.1998) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). There is a strong presumption that counsel's performance was reasonable. *State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986).

We first address appellant's argument that trial counsel's failure to seek a change of venue before trial was objectively unreasonable and affected the outcome of the trial. With his petition for postconviction relief, appellant provided numerous copies of newspaper articles and transcripts of radio segments discussing the drowning investigation and trial, and an affidavit by his mother alleging that trial counsel told her that he should have sought a change of venue. Appellant also later provided the affidavit of an attorney who explained why a change of venue was necessary.

Even if true, appellant's allegations do not cast doubt on the jury's fairness and impartiality. As the postconviction court noted, "the court and counsel at trial scrupulously examined prospective jurors concerning their awareness of pretrial publicity." The record indicates that several jurors remembered nothing about the events in question and that the rest had

minimal information about the drowning. Consequently, regardless of pretrial and trial publicity, appellant does not allege facts sufficient to show that the postconviction court abused its discretion in concluding that trial counsel's decision not to seek a change of venue was reasonable and probably did not affect the outcome of the trial.

We next turn to appellant's argument that his trial counsel was ineffective in failing to zealously challenge Dr. McGee's testimony through the presentation of Dr. Plunkett's theories, and in failing to conduct a reasonable investigation, which appellant claims would have led to the discovery of Northern Inn guests Brian Hunter and Nichole Bauman and the inclusion of their testimony at trial. The state argues that these claims should be dismissed for the same reasons the court denied appellant's posttrial motion for a new trial based on newly discovered evidence. In essence, the state claims that the district court resolved the prejudice prong of appellant's ineffective assistance claim by ruling that the result was not likely to be different if a new trial were granted on the basis of "cumulative" newly discovered testimony.

For several reasons, we reject the state's argument. First, the United States Supreme Court stated in *Strickland*:

[T]he newly discovered evidence standard [requiring a showing that the evidence would "more likely than not" have affected the trial's outcome] is not an apt source from which to draw a prejudice standard for ineffectiveness claims [because t]he high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. An ineffective assistance claim asserts the absence of one

of the crucial assurances that the result of the proceeding is reliable * * *.

466 U.S. at 694, 104 S.Ct. 2052 (citations omitted). The postconviction court was asked to but did not address whether there was a "reasonable probability that, but for counsel's * * * errors, the result of the proceeding would have been different," a standard different than that applied on a newly discovered evidence claim. *Id.* ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). The court's rulings regarding new evidence cannot substitute for the requested analysis on the ineffective assistance of counsel claim.

Second, because the district court's denials of appellant's new trial motion and the postconviction petition were based on a record more limited than the one before the court after the motion for reconsideration, we cannot rely on the district court's findings and conclusions made prior to that point. Although appellant's failure to provide the postconviction court with the supplemental affidavits until after the original petition unnecessarily complicated the court's responsibilities, the court ultimately had the current record before it.

We must determine, then, whether an evidentiary hearing was required on appellant's remaining ineffective assistance of counsel claims. An evidentiary hearing is not necessary if the petition, files, and record "conclusively show that the petitioner is entitled to no relief." Minn.Stat. § 590.04, subd. 1. To determine whether this standard has been met, the postconviction court must consider the nature of the evidence presented at trial. *See, e.g., Sutherlin v. State*, 574 N.W.2d 428, 436 (Minn.1998); *Hodgson*, 540 N.W.2d at 518. In this case, the state's evidence was entirely circumstantial, focusing on the physical condition of Jane's

body, possible motive, and appellant's demeanor when he pulled the boat up to the dock and reported the incident. The testimony of the shore witnesses was also important to the state's case, as none of them noticed more than one boat on Green Lake at the time of the incident and one testified to hearing a voice saying "Stop. No. It hurts."

It is against this backdrop that we review the postconviction court's denial of postconviction relief. First, we conclude that the affidavits submitted by Dr. Plunkett and the two expert defense lawyers, which go to the effectiveness of trial counsel's representation, raise material questions. Specifically, important issues exist regarding trial counsel's alleged failure to thoroughly challenge the state's expert, Dr. McGee, or to provide thorough countering medical testimony as suggested by Dr. Plunkett. An evidentiary hearing is necessary to determine whether the level of trial counsel's advocacy was unreasonable and may have affected the outcome of the trial.

Second, as asserted in the expert attorneys' affidavits, the Hunter and Bauman affidavits raise material fact questions as to the scope of trial counsel's investigation because their affidavits establish at least the possibility of contradicting the state's important evidence regarding appellant's demeanor. We note that only Hunter and Bauman contradict the shore witnesses' testimony that the boat approached the inn at a slow rate of speed and the bouncer's testimony that appellant did not seem agitated as he walked toward the inn. Hunter and Bauman also claim to have seen five or six boats on the lake, contrary to the shore witnesses' claims that there was just one boat. Lastly, their affidavits corroborate appellant's statements that there were several boats on the lake and that he drove fast to avoid a particularly boisterous par-

ty. Given the state's theory of the case, we conclude that the affidavits submitted with the motion for reconsideration raise material fact issues regarding the reasonableness of trial counsel's investigation and the probability that the outcome at trial may have been different. Because we cannot say that the record conclusively shows that appellant is not entitled to relief, a postconviction hearing is required. *See* Minn.Stat. § 590.04, subd. 1.

 While an evidentiary hearing is necessary in this case, we note that not every ineffective assistance of counsel claim will require an evidentiary hearing at the postconviction court. A petitioner's allegations in a postconviction petition must be "more than argumentative assertions without factual support." *Beltowski v. State,* 289 Minn. 215, 217, 183 N.W.2d 563, 564 (1971). However, neither should evidentiary hearings be presumptively denied. A postconviction court must evaluate whether, in light of the significance of the claimed error and the evidence presented at trial, a petitioner has raised and factually supported material matters that must be resolved in order to decide the postconviction issues on their merits. *Hodgson,* 540 N.W.2d at 517–18. As we have said, doubts concerning whether to conduct an evidentiary hearing should be resolved in favor of the party requesting the hearing. *Roy,* 277 Minn. at 244, 152 N.W.2d at 305. A hearing is particularly appropriate in this case because the evidence regarding appellant's demeanor, the testimony of the shore witnesses, and Dr. McGee's medical opinions were so important to the state's wholly circumstantial case.

In summary, we hold that the district court did not abuse its discretion in admitting into evidence the videotape, clay model, and testimony of Mason, Wieland, and Johnson. We further hold that with the

exception of the change of venue issue, material questions of fact remain regarding appellant's ineffective assistance of counsel claim and remand so that these questions may be resolved after an evidentiary hearing. Specifically, the postconviction court must determine whether counsel's conduct "fell below an objective standard of reasonableness" and whether "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland,* 466 U.S. at 688, 695, 104 S.Ct. 2052. This hearing will serve the limited purposes of eliciting testimony from Hunter, Bauman, Dr. Plunkett, and other witnesses necessary to a determination of the reasonableness of trial counsel's actions and whether there is a reasonable probability of a different outcome absent trial counsel's alleged errors.

We retain jurisdiction of this case and order that this appeal is stayed so that the postconviction court may conduct an evidentiary hearing and issue findings and conclusions on the issues herein described. Appellant shall, within 60 days of entry of the resulting order from the postconviction court, move this court to dismiss or vacate the stay of the appeal. If either party wishes to appeal the decision of the postconviction court, that party shall file and serve in this court a supplemental brief not to exceed 20 pages within 60 days after the order dismissing or vacating the stay. The other party shall file and serve its brief, similarly limited in length, in this court 45 days thereafter.

Appeal stayed and remanded for postconviction proceedings.