IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 14, 2002 Session

## ROY WILLIAM GRAY v. NANCY JANE GRAY

**Appeal from the Circuit Court for Knox County**
**No. 82504     Bill Swann, Judge**

**FILED SEPTEMBER 19, 2002**

**No. E2001-02470-COA-R3-CV**

---

In this divorce case from the Circuit Court for Knox County the Appellant, Roy William Gray, contends that the Trial Court erred in failing to disqualify counsel for the Appellee, Nancy Jane Gray. Mr. Gray further contends that the Court erred in dividing the marital assets, in granting both parties a divorce, and in awarding Ms. Gray post trial attorney's fees. Ms. Gray asserts that she should be reimbursed for attorney's fees incurred by her in responding to this appeal upon the grounds that the appeal is frivolous and devoid of merit. The judgment of the Trial Court is affirmed in part and reversed in part.

**Tenn.R.App.P. 3; Judgment of the Circuit Court Affirmed in Part and Reversed in Part; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Ricky A.W. Curtis, Knoxville, Tennessee, for the Appellant, Roy William Gray

Sarah Y. Sheppeard, Knoxville, Tennessee, for the Appellee, Nancy Jane Gray

**OPINION**

In this appeal from a judgment for divorce entered by the Circuit Court for Knox County five issues are presented for our review which we restate as follows:

1. Did the Trial Court err in failing to disqualify the attorney for Nancy Jane Gray, the Appellee, when it was shown that such attorney had prepared the will of the Appellant, Roy William Gray, approximately ten years prior to the present divorce action?

2. Did the Trial Court err in its division of the marital estate?

3. Did the Trial Court err in granting a divorce to both parties?

4. Did the Trial Court err in awarding attorney's fees to Ms. Gray?

5. Should Ms. Gray be reimbursed for attorney's fees incurred by her in defending this appeal?

This is a non-jury case and, accordingly, our review is *de novo* upon the record of the Trial Court. A trial court's findings of fact are entitled to a presumption of correctness and, absent evidence preponderating to the contrary, we must affirm those findings pursuant to T.R.A.P. 13(d). *Kincaid v. Kincaid*, 912 S.W.2d 140 (Tenn. Ct. App. 1995). There is no presumption of correctness as to the correctness of a trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 (Tenn. 1996).

This case began in May of 1999 when Mr. Gray filed a complaint for divorce in the Knox County Circuit Court to which Ms. Gray responded by answer and counter-complaint. By motion filed on May 1, 2000, and subsequent amendment thereto on May 2, 2000, Mr. Gray requested that the Trial Court discharge Ms. Gray's attorney, Sara Sheppard, on the grounds that Ms. Sheppeard had previously prepared Mr. Gray's will. This motion was denied and trial began on May 2, 2000. On September 13, 2000, the Court entered its final judgment granting both parties a divorce on the grounds of inappropriate marital conduct and ordering that the marital assets be divided equally between the parties. Thereafter, Mr. Gray filed a motion for new trial and Ms. Gray filed a motion seeking payment of funds due her pursuant to the judgment for divorce. The Court granted Ms. Gray's motion by order entered February 2, 2001, *nunc pro tunc* as of January 19, 2001.

On February 2, 2001, Ms. Gray filed an additional motion averring that the funds which the Court had ordered Mr. Gray to pay in its order of January 19, 2001, had still not been paid, that Mr. Gray was, accordingly, in contempt of court and that he should be taxed with attorney fees, court costs and discretionary costs in consequence. At a hearing on February 16, 2001, the Court denied Mr. Gray's motion for new trial. At this time, Mr. Gray paid Ms. Gray the monies requested in her motion and Ms. Gray voluntarily dismissed that portion of her motion seeking an adjudication of contempt.

On June 8, 2001, Ms. Gray filed an additional motion seeking remaining assets due her under the divorce decree which she averred that Mr. Gray had not yet turned over to her despite the Court's orders that he do so. In this motion Ms. Gray also averred that Mr. Gray should be responsible for attorney fees incurred by her since the Court entered its final judgment on September 13, 2000. This motion was heard by the Court on June 15, 2001, at which time the Court ordered that Mr. Gray transfer assets to Ms. Gray as required by the final judgment. The Court further ordered that Mr. Gray pay Ms. Gray post-trial attorney fees in the amount of $2,500.00. This appeal followed.

The first issue we address is whether the Trial Court erred when it failed to disqualify Ms. Sheppeard as Ms. Gray's attorney.

Our standard of review of the Court's ruling with respect to attorney disqualification is whether the Trial Court abused its discretion and, absent a finding that the Trial Court abused its discretion, its ruling will be affirmed by this Court. *Clinard v. Blackwood*, 46 S.W.3d 177 (Tenn. 2001). Abuse of discretion occurs when a trial court "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *Clinard, ibid.* citing *State v. Shirley*, 6 S.W.3d 243 (Tenn. 1999). Applying this standard to the Trial Court's ruling in the present case we are compelled to find that the Court did not abuse its discretion.

The record shows that at some point in 1989 Mr. and Ms. Gray met with Ms. Sheppeard in her office to discuss the preparation of their wills and to advise her as to how they wanted their property to be distributed in the event of their death. Thereafter, the Grays returned to Ms. Sheppeard's office and signed wills prepared by her in compliance with their instructions.

Mr. Gray asserts that, in consequence of Ms. Sheppeard having prepared his and his wife's wills in 1989, at the time the instant divorce proceedings were commenced either 1)Ms. Sheppeard was engaged in his ongoing representation or 2) he was Ms. Sheppeard's former client. In either event, Mr. Gray argues, Ms. Sheppeard should not be allowed to represent Ms. Gray in this case over his objection.

With respect to his contention that Ms. Sheppeard should be disqualified from representing Ms. Gray in this case, Mr. Gray cites Disciplinary Rule 5-105 of Rule 8 of the Rules of the Supreme Court of the State of Tennessee which states:

> (A) A lawyer shall decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5-105(C).

> (B) A lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5-105(C).

> (C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each.

Mr. Gray asserts that, because he and Ms. Gray have differing interests in this divorce case, Ms. Sheppeard's ongoing representation of himself and simultaneous representation of Ms. Gray without his consent violates parts (A) and (B) of the above rule. Mr. Gray further asserts that Ms. Sheppeard's representation of Ms. Gray under the circumstances in this case violates Tennessee case law, citing in support the case of *Clinard v. Blackwood*, *ibid.* which provides that an attorney is prohibited from simultaneously representing two persons having adverse interests in the same subject matter.

Mr. Gray's assertion of a continuing attorney client relationship between himself and Ms. Sheppeard appears to be based on his averments that no letter terminating Ms. Sheppeard's employment relationship with Mr. Gray is in evidence, that the two wills prepared by Ms. Sheppeard named each spouse as personal representative of the other's estate, and that Ms. Sheppeard retained his original will for probate in the event of either party's death. Mr. Gray maintains that, "[u]nder such circumstances [he] would certainly have contacted Ms. Sheppeard in the event of his Wife's death to assist with the administration of his Wife's estate. Accordingly, Ms. Sheppeard remained in an attorney-client relationship with [him] at the commencement of the proceedings."

The record before us shows no evidence of contact between Mr. Gray and Ms. Sheppeard from the time she prepared his and Ms. Gray's wills until the commencement of the divorce proceedings approximately ten years thereafter. Mr. Gray's testimony confirms that he and his wife consulted Ms. Sheppeard for the purpose of having their wills drafted, that Ms. Sheppeard drafted the wills and that they signed the wills after reviewing them. The fact that there is no letter terminating the employment relationship between Mr. Gray and Ms. Sheppeard does not compel us to the conclusion that that relationship continued ten years later. On the contrary, the record indicates that the limited task for which Ms. Sheppard was employed by the Grays in 1989 was the drafting of their wills commensurate with their instructions and that that task was satisfactorily completed ten years ago. Mr. Gray's testimony at trial does not compel a conclusion to the contrary.

It is undisputed that each party was named in the other's will as the personal representative of the other's estate. However, we fail to see how this fact would warrant the conclusion that there was a continuing attorney client relationship between Mr. Gray and Ms. Sheppeard. Ms. Sheppeard's continuing participation as the Grays' attorney would have been absolutely unnecessary to the implementation of such a provision in the wills.

Finally, Mr. Gray asserts in his brief that Ms. Sheppeard retained his original will for probate in the event of the death of either Ms. Gray or himself. The apparent implication of this assertion is, of course, that Ms. Sheppeard intended that she would continue to represent the Grays in matters relevant to the disposition of their estates. However, Ms. Sheppeard denies that she retained Mr. Gray's original will and our review of the record shows that his present assertion to the contrary is unsubstantiated by either his own testimony or by any other competent evidence. The only allusion in the record to the alleged retention of the original will by Ms. Sheppeard lies in statements made by Mr. Gray's attorney.

Mr. Gray argues that, even if Ms. Sheppeard's representation of him was not ongoing at the time the present divorce proceedings began, she should still be disqualified based on her former representation. Mr. Gray contends that, in the context of the former representation regarding his will, he divulged information to Ms. Sheppeard as to the nature and extent of his property. Mr. Gray maintains that the decisive issue in this divorce is the classification and division of the parties' property and, therefore, the subject matter involved in the former representation and the subject matter involved in the current divorce case are identical. Mr. Gray further asserts that the Trial Court specifically found that the subject matter of the wills preparation and the subject matter of the present case are substantially related. Mr. Gray argues that case law requires that Ms. Sheppeard be removed as counsel for Ms. Gray. In support Mr. Gray cites *Clinard*, *ibid,* and *Buchanan v. Morton*, 25 B.R. 162 (Bankr. E. D. Tenn. 1982) for the proposition that a lawyer may not represent interests adverse to those of a former client if the subject matter of the new representation is substantially related to the subject matter of the previous representation.

In addressing the question of whether there is a substantial relationship between the subject matter of the present divorce and that of the previous estate matter we are, first of all, compelled to disagree that the Trial Court specifically found such a relationship. In support of this assertion Mr. Gray appears to rely upon a comment of the Trial Court made in response to the statements of Mr. Gray's attorney at the hearing on February 16, 2001:

> MR. CURTIS: Also, when you look at the substantially related matters, the case there, in Re Buchanan, gives us some assistance as to whether or not it's substantially related. Here common sense tells it is. We're dealing with exactly the same subject matter. It's the nature, extent, and value of the property. It was-- that's all that was discussed in Ms. Sheppeard's office, and it was the primary issue at the trial of this divorce--
>
> THE COURT: I think you can take that as established.

It is apparent to us that the import of the Court's comment is, not that it is established that there is a substantial relationship between the subject matter of the wills drafting and the divorce, but rather that it is established that the nature, extent and value of the parties' property was the primary issue at the trial of the divorce. The Court's assessment in this regard is undisputed by the record it being evident that this case is largely concerned with the division of marital property.

We do not find a substantial relationship between the subject matter of the current divorce case and the preparation of his will ten years ago. If 'subject matter' in this case is held to mean 'the nature of the proceeding involved' then there is not a substantial relationship because the present matter is a divorce matter and the previous matter was solely an estate matter and, according to Mr. Gray's own testimony, occurred at a time when divorce was not contemplated. Mr. Gray's argument appears to be that the parties' property is the subject matter involved in both the drafting of the wills and the divorce. Obviously, by a loose, non-specific definition of 'property' the parties property was involved in the estate matter and the parties' property is involved in the divorce matter. However,

we do not believe such a general definition of property is sufficient in making a conflict of interest determination. We believe that 'property' must be viewed to mean those specific, identifiable things owned by the Grays at the time their wills were drafted and at the time of their divorce. Upon our review of the record we do not find evidence showing that the items of property owned by the Grays when Ms. Sheppeard drafted their wills are substantially related to the items of property which are the focus of this divorce. In fact, there is proof that much of the parties' property, such as their residence, was acquired years after Ms. Sheppeard drafted the Grays' wills.

In any event, it is our determination that the basic reason for prohibiting an attorney from representing interests adverse to those of a former client where there *is* a substantial relationship in subject matter is that the attorney will use confidences or secrets divulged to him by the former client to that client's disadvantage. That this is so is evident from the case of *Mills v. Crane*, an unreported opinion of this Court filed in Knoxville on April 10, 1987.

In *Mills* the plaintiffs argued that the trial court erred in not disqualifying counsel for the defendants because of his prior representation of the plaintiffs. In affirming the ruling of the trial court this Court was guided by Tennessee case law as well as by case law from other states. The following language cited from *National Texture Corp. v. Hymes*, 282 N.W.2d 890, 894 (1979) makes it clear that the essential problem to be addressed in matters such as the one now before us is whether current representation of interests adverse to a former client will result in the disclosure of confidences and secrets previously disclosed to the attorney by that client:

> An attorney should not use information he received in the course of representing a client to the disadvantage of that client. In this regard, the attorney should exercise care to prevent disclosure of confidences and secrets of one client to another and decline employment that would require such disclosure. ABA Code of Professional Responsibility EC 4-5. See also, id. DR 4-101. This obligation to preserve the secrets and confidences imparted by a client continues even after the termination of employment. ABA Code of Professional Responsibility EC 4-6. An attorney should similarly refrain from representing a party in an action against the former client where [t]here is an appearance of a conflict of interest or a possible violation of confidence, even if such may not be true in fact. 2 American Bar Association Committee on Ethics and Professional Responsibility, Informal Ethics Opinions 23 (1975). The purpose for disqualification in such situations is to ensure the attorney's absolute fidelity and to guard against inadvertent use of confidential information. *Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268, 271 (2 Cir. 1975).

> The test generally applied to determine the existence of a conflict of interest is whether there is a substantial relationship between the subject matter of a pending action and those matters in which the attorney is alleged to have previously represented the client. *Redd v. Shell Oil Co.,* 518 F.2d 311 (10 Cir. 1975); *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265 (S.D.N.Y.

1953).  On[c]e the substantial relationship test is met, it will be assumed that confidences bearing on the subject matter of the current representation were disclosed.  *Richardson v. Hamilton International Corp.* , 469 F.2d 1382, 1385 (3 Cir. 1972), certiorari denied, 411 U.S. 986, S.Ct. 2271, 36 L.Ed.2d 964 (1973); *T.C. Theatre [C]orp. v. Warner Bros. Pictures*, 113 F.Supp. 265, 268 (S.D.N.Y. 1953).

Even had Mr. Gray  shown  a substantial relationship between the subject matter of the two representations in the case before us giving rise to the assumption of a disclosure of confidence noted in the above language cited from the *National Texture Corp.* case we find that such an assumption cannot survive given the following testimony elicited from Mr. Gray by Ms. Sheppeard at trial:

> Q.  Did you and your wife come to meet with me sometime in 1989 about having wills drafted?
> A. Sometime around that period, yes.
> Q.  Anything you disclosed to me about your financial situation was in the presence of your wife?
> A. Yes.
> Q. Did you ever call me and say I've got some secret things, don't tell my wife this, but you need to know them to prepare the wills?
> A. No
> ...
> Q. Tell the Court what we talked about in that first meeting.
> A. How I wanted my property taken care of in the case of my death.
> Q. All right.  And Mrs. Gray was present?
> A. Yes.
> Q. And she also talked about how she wanted her property taken care of, didn't she?
> A. Yes.
> Q. And then sometimes later I drafted a will.  Probably, did I send copies to you and Mrs. Gray before you came back in?
> A. Yes.
> Q. Did you read those copies?
> A. Yes.
> Q. Did they say what you wanted them to say?
> A. To the best of my knowledge.  There was only a minor change or two.
> Q. Did you and Mrs. Gray come back into my office?
> A. Yes.
> Q. Did you sign those wills?
> A. Yes.
> ...

Q. Were there any secrets? I'm not asking you what they were. Were there any deep dark secrets that you told me when you came in to have that will done?

A. Well, the way I structured it, the way I wanted it structured covered what I wanted done. I may not have told you the total thing I wanted conveyed, but I gave you enough information to get it done.

Q. You didn't tell me about any hidden offshore accounts, did you?

A. No. I don't have any.

Q. All right. You didn't tell me you had any mistresses, did you?

A. I didn't have any.

Q. Okay. You didn't have any deep dark secrets to tell me, or that you did tell me, and everything you said to me you said in the presence of Nancy Gray; correct?

A. Yes.

Q. You haven't had any conversations with me since those wills were executed until this lawsuit started; isn't that correct?

A. That's correct.

Q. You haven't conveyed any secrets to me in any fashion during those intervening years, have you?

A. No.

It is apparent from Mr. Gray's testimony that he provided no information to Ms. Sheppeard regarding the preparation of the wills outside of the presence of Ms. Gray. Thus, whatever information he may have disclosed to Ms. Sheppeard in relation to that matter cannot be deemed confidential in any relevant or meaningful sense. Based upon this finding and our review of the entire record in this case we are compelled to conclude that the Trial Court did not abuse its discretion in ruling that Ms. Sheppeard should not be disqualified as counsel for Ms. Gray by reason of her former representation of Mr. Gray.

The next issue addressed is whether the Trial Court erred in dividing the marital property equally between the parties.

T.C.A. 36-4-121(c) provides that the court shall consider the following factors in making an equitable distribution of marital property:

(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
(4) The relative ability of each party for future acquisitions of capital assets and income;
(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the

contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective.

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

A trial court is allowed wide latitude in determining an equitable division of marital property and we will defer to the trial court's determination unless its decision is inconsistent with those factors set forth at T.C.A. 36-4-121(c) or the preponderance of evidence is contrary. *Barnhill v. Barnhill*, 826 S.W.2d 443 (Tenn. Ct. App. 1991).

Mr. Gray asserts that proper consideration of several of the factors set forth under T.C.A. 36-4-121(c) prohibits an equal division of the marital property in this case and entitles him to receive a larger portion of the marital estate than Ms. Gray.

First, Mr. Gray argues that, with respect to T.C.A. 36-4-121(c)(2), he is financially disadvantaged in that his age, physical and mental health, vocational skills, and employability prevent him from working whereas Ms. Gray is gainfully employed and her ability to earn an income is not impaired by disability.

The record shows that at the time of trial Mr. Gray was fifty eight years of age while Ms. Gray was fifty four and that the age discrepancy between the parties was approximately three years and four months. We do not find this discrepancy to be significant enough to warrant a finding that Mr. Gray was relatively disadvantaged as a consequence of his age.

Although Mr. Gray asserts that he doesn't think he can hold down a job because he has trouble sleeping and can't get adequate rest, he presents no medical evidence that this or any other physical problem is sufficiently debilitating to justify his receipt of a larger portion of the marital estate. Although it is undisputed that Mr. Gray has suffered from some degree of depression there is no expert evidence in the record as to the severity of his condition or as to whether it might be controlled or eliminated through therapy and/or medication. The record does show that, although Mr. Gray was in counseling for a period of six months after he filed his complaint for divorce, he chose to discontinue such counseling and there is no indication that he has otherwise sought help for this problem. Although we are sympathetic to Mr. Gray, at the same time we believe that he bears

some responsibility to avail himself of treatment resources which could alleviate his depression. Other than the six months of treatment noted, there is no proof that he has done so.

Furthermore, there is nothing in the record that convinces us that a relative disparity between the parties as to vocational skills and employability warrants that Mr. Gray receive a larger portion of the marital estate than Ms. Gray. Ms. Gray's highest level of education is high school. She has job experience as a cashier, payroll clerk, and phlebotomist. While working as a phlebotomist she received on the job training as a histologist and she is currently employed in that capacity with the Knoxville Dermatopathology Laboratory and where she earns $15.50 per hour. After graduating from high school, Mr. Gray received a year of training in drafting and was subsequently employed as a draftsman at T.V.A. from 1966 until his retirement in 1994. While employed at T.V.A. Mr. Gray obtained a two year associate of science degree in mechanical engineering technology and for a period of time shortly after his retirement he was licensed as an affiliate real estate broker. Mr. Gray is currently unemployed and indicates that his training in drafting is obsolete because drafting is now computer aided and he is a manual drafter. However, we agree with the Trial Court's observation that Mr. Gray has a computer and, if he wishes to remain a draftsman, he can learn.

Mr. Gray also argues that T.C.A. 36-4-121(c)(4) supports his receiving a greater share of the marital estate because Ms. Gray has a relatively greater ability to acquire capital assets and income. In support of this argument Mr. Gray cites page 64 of the trial record; however, our review of this portion of the record shows that it presents evidence of the circumstances of Ms. Gray's employment as a histologist including the fact that she earns $15.50 per hour. We do not find this to be sufficient evidence to support Mr. Gray's argument for disparate treatment nor do find evidence elsewhere in the record preponderating in favor of his argument in this regard.

Mr. Gray next contends that under T.C.A. 36-4-121(c)(5) he should receive a larger share of the marital estate asserting that he acquired almost all of the marital property with minimal contribution from Ms. Gray. We disagree. The record shows that Ms. Gray took on the role of homemaker in this marriage and, commensurate with that role, she assumed responsibilities in the marriage which allowed her husband to concentrate his time and energy upon his employment outside the home. Ms. Gray testifies that she stayed at home and took care of the parties' son[1] from the time of his birth until he began kindergarten and that, throughout the thirty three year marriage she cooked and did laundry and cleaning for the family without assistance from Mr. Gray. Ms. Gray also testifies that during the marriage she made clothes for herself and her son, did yard work and canned food from the family's garden. Ms. Gray further testifies that she performed various necessary tasks with respect to rental properties owned by the parties such as cleaning, answering the phone and showing the properties and that she also assisted in the properties' painting and upkeep.

Mr. Gray asserts that, although Ms. Gray worked during the marriage she did not contribute financially to the marriage and that she spent her income on "incidentals"and thereby dissipated

---

[1] The parties' son is their only child and was an adult at the time of their divorce.

marital assets. Mr. Gray does not refer us to any specific evidence in the record to support this assertion; however, we do note evidence to the contrary in the following testimony from Ms. Gray when asked about how she disposed of the income from her job:

> Q. What did you do with the money that you earned ?
> A. I bought groceries. I paid for anything that I needed, anything that my child or our child needed.
> Q. Clothing?
> A. Clothing.
> Q. School supplies?
> A. School supplies.
> Q. Hair cuts?
> A. Yes. When we ate out, I always paid for that, you know. When Roy was home on the weekends or any time, usually if we took -- his brother-in-law was good to help me do anything that I couldn't do anything when he was out of town. We would take them out. I would give Roy the money before we got to the destination. Any leisure things that we did, I paid for those. A lot of times I paid for vacations, maybe not all of it, but maybe the majority of it, that sort of thing.

Next Mr. Gray refers us to T.C.A. 36-4-121(c)(8) and argues that the Court failed to properly consider the economic circumstances of the parties at the time the division of the marital property was to become effective. Had the Court done so, Mr. Gray contends that he would have been awarded a greater portion of the marital estate, his economic circumstances being worse than those of Ms. Gray. In support of this contention Mr. Gray asserts that Ms. Gray is gainfully employed while his sole source of income consists of his monthly pension.

We disagree that the Mr. Gray's economic circumstances warrant that he be rewarded a larger share of the marital estate. As Ms. Gray has pointed out in her brief, the record confirms that, in addition to his monthly pension of $2,607.63, Mr. Gray realizes income in the gross amount of $1,300.00 from three separate rental properties which were retained by him after the divorce. The total of these two figures, $3, 907.63, exceeds Ms. Gray's monthly gross income which is calculated to be $2,686.67 based upon her working forty hours a week at her current earnings of $15.50 per hour. Mr. Gray's argument is without merit.

Next, Mr. Gray contends that T.C.A. 36-4-121(c)(9) supports his receiving a larger portion of the marital estate because much of the property awarded him in the divorce consists of real estate. Mr. Gray argues that the sale of this real property will involve the payment of capital gains taxes and that he, therefore, bears a greater tax burden than does Ms. Gray. We do not agree that the record supports a greater award to Mr. Gray on this basis. There is no proof in the record that a sale of the real property awarded to Mr. Gray is anticipated nor has Mr. Gray offered proof as to the tax consequences he asserts. A t the hearing on Mr. Gray's motion for new trial the Trial Court stated as follows:

-11-

The adverse tax consequences fall substantially on both sides. There are adverse tax consequences on each side. We don't see anything there to disrupt the equities here. It is hard to weigh one kind of asset against another, particularly as we look at prospective growth of that asset.

We do not disagree with the Trial Court's statement regarding tax consequences in this case and we find that Mr. Gray's argument is without merit.

Finally, with respect to the division of marital property, Mr. Gray refers us to T.C.A. 36-4-121(c)(10) which requires that in dividing the marital estate the Trial Court consider the amount of social security benefits available to each spouse. Mr. Gray asserts that there is no indication that the Court valued the social security benefits available to Ms. Gray and that, while Mr. Gray's pension was assigned a present day value and credited towards his portion of the marital estate, Ms. Gray's social security earnings were not. Mr. Gray further contends that, although the record indicates that a percentage of his pension was his separate property, when the Trial Court assigned a present value to the pension it did not reduce the value by the appropriate percentage.

We find no proof in the record that Ms. Gray is entitled to receive social security benefits at the present time. Anticipated social security benefits are not part of the marital estate because they are not vested as required by T.C.A. 36-4-121(b)(1)(B). *Reymann v. Reymann*, 919 S.W.2d 615 (Tenn. Ct. App. 1995). Accordingly, the Trial Court did not err in failing to consider Ms. Gray's social security benefits as part of the marital estate.

As noted, Mr. Gray also contends that, although a percentage of his pension was his separate property, the Trial Court failed to take this into account when it assigned a present value to the pension. In support of his contention that a portion of the pension was his separate property Mr. Gray refers us to his testimony at page 260 of the trial record which includes the following:

Q. When you were retired, were you given any time credit with TVA for your military service?
A. Yes, I was. It's included in my pension.
Q. And were you married before or after you got out of the service?
A. After. I didn't even meet her until after I was out of the service.

We do not find that the issue of whether the Trial Court properly considered Mr. Gray's separate ownership of part of his pension is relevant to T.C.A. 36-4-121(c)(9) although raised on appeal in that context. It is our determination that this issue was, in fact, never raised in the Trial Court and it cannot be raised for the first time on appeal. *Knoxville's Community Development v. Wright*, 600 S.W.2d 745 (Tenn. Ct. App. 1980). Accordingly, we decline to review this issue.

The next issue we address is whether the Trial Court erred in granting both parties a divorce rather than granting a divorce to Mr. Gray alone.

The Trial Court's final judgment of divorce in this case recites that "[a] divorce is hereby granted to the parties on the grounds of the inappropriate marital conduct of each." Mr. Gray contends that the record shows that Ms. Gray engaged in inappropriate marital conduct by meeting with other men in Internet chat rooms and that she subsequently met with these men in person and even spent the night with one of them before Mr. Gray filed his divorce complaint. Mr. Gray maintains that, according to Ms. Gray's testimony, the only act of inappropriate conduct which he committed during the marriage occurred years before the divorce was filed. Mr. Gray argues that, even if he is found to have been partially at fault in the dissolution of the marriage, Ms. Gray is more at fault and, therefore, he alone should have been granted the divorce.

Our review of the record reveals inappropriate conduct on the part of each of these parties during the time they were married. Ms. Gray's attorney conceded in closing argument that Ms. Gray's online conversations with another man were inappropriate marital conduct. However, we also note evidence presented by the testimony of Ms. Gray with respect to instances of inappropriate conduct by Mr. Gray. As stated, Mr. Gray asserts that Ms. Gray testified that he committed only one act of inappropriate conduct, apparently referring to the occasion of his having contracted a venereal disease as a result of his encounter with another woman. Although this particular incident took place several years prior to the initial filing of a divorce complaint in this case, we find that the testimony of Ms. Gray provides evidence of additional and more recent inappropriate conduct by Mr. Gray as follows:

> Q. After he filed for divorce, did you all have any discussions about divorce?
> A. Well, he filed for divorce before I even realized that he had done that. We sat down and we tried to discuss it. He had a gun that he put on his -- I just observed a gun laying on his lap while we were talking. I was on one side of the den and he was on the other sofa. I asked him, is that a gun that you have. He said, yes, it is. And I tried to stay as calm as I could, but I was very frightened. He told me that I would never get any assets that he had, that he had worked, he had earned the money and that therefore I could leave with my clothes if I wanted to.
> Q. What happened after that?
> A. As I said, I tried to stay as calm as I could. I was very upset. I didn't stay downstairs very long. I went upstairs. He stayed downstairs. But when we had our discussion, I told him, I said, surely you wouldn't do anything crazy like that because of our son and both of our mothers are still alive. He told me, well, if I tried to take anything that he had that he didn't have any reason for living. And if he didn't live, I wasn't going to live either.
> ---
> Probably a week after that confrontation, one Sunday afternoon he came in and sat down and we tried to talk. I didn't see a gun that he had then. I don't know if he had a gun or not. He told me that he just wished instead of contacting an attorney, that he had just blown my head off and blown a friend's head off.

Ms. Gray further testified that when she informed Mr. Gray of her intent to obtain an order

-13-

of protection he told her that it wouldn't do her any good and that if he wanted to do away with her he would anyway.

Tennessee case law supports a finding of cruelty (and, therefore, inappropriate marital conduct) when there is "willful, persistent causing of unnecessary suffering, whether in realization or apprehension, whether of body or mind, in such a way as to render cohabitation dangerous and unendurable." *Schwalb V. Schwalb*, 282 SW2d 661 (Tn. Ct. App. 1955). In light of the testimony cited above and the record as a whole we find that the Trial Court did not err in granting a divorce to both parties in this case. Mr. Gray's contention that he was responsible for only one instance of inappropriate marital conduct and that Ms. Gray was more at fault than he are without merit.

The final issue presented by Mr. Gray in this appeal is whether the Trial Court erred in awarding attorney fees to Ms. Gray at the post trial hearing on June 15, 2001. Ms. Gray maintains that the Trial Court's order of June 15, 2001, which requires that Mr. Gray pay Ms. Gray's attorney fees to the extent of $2,500.00, was an award of alimony *in solido* as was requested by Ms. Gray in her counterclaim filed on June 15, 1999. Ms. Gray asserts that this award was based upon the Trial Court's finding of fault on behalf of Mr. Gray in delaying the entry of a final order in the case and in failing to comply with the requirements of the Court's decision. Our review of the Court's memorandum opinion and findings of fact dated June 15, 2001, confirms the accuracy of these assertions. The Court states that the approach of Mr. Gray and his counsel in this case has been one of "delay, delay and delay" and that "this husband has acted with malice in attempting to delay the entry of that order, the divorce decree, every step of the way." Ms. Gray argues that, in considering the appropriateness of awarding attorney fees, the Court is obligated to consider the relevant statutory factors regarding alimony set forth at T.C.A. 36-5-101 and that one of these factors is the relative fault of the parties.

A trial court is allowed discretion in awarding attorney fees and its decision to do so will be affirmed absent unless there is a showing of abuse of discretion. *Houghland v. Houghland*, 844 S.W.2d 619 (Tenn. Ct. App.1992).

In support of her argument that she is entitled to attorney fees based upon a finding that Mr.Gray was at fault in this case, Ms. Gray cites the case of *Lindsey v. Lindsey*, 976 S.W.2d 175 (Tenn. Ct. App. 1997). It is correct that in *Lindsey* we noted that the trial court could properly consider the relative fault of the parties in awarding the wife attorney fees. However, we also noted in that case that "[a] spouse with adequate property and income is not entitled to an award of additional alimony to compensate for attorney's fees and expenses."

In *Wilder v. Wilder*, 66 S.W.3d 892 (Tenn. Ct. App. 2001), we addressed the issue of whether the trial court abused its discretion in ordering the wife to pay $18,000.00 of the husband's attorney's fees. Giving reasons for its ruling, the trial court in *Wilder* stated that the proceedings were created by the wife's adultery, that, had the divorce been a no-fault divorce each party would have paid its own attorney's fees and that the husband was entitled to having his attorney's fees paid because "this was all being motivated because of his ex-wife's behavior in this case." This Court reversed the trial

court's ruling, noting that the trial court focused singularly upon the fault and behavior of the wife and that "the record [was] devoid of any indication that the Judge considered the husband's financial need or the wife's ability to pay" Citing *Gilliam v. Gilliam*, 776 S.W.2d 81 (TennCt. App. 1988), we further noted in *Wilder* that "while fault is a factor to be considered, it must not be applied in a punitive manner against a guilty party in determining the award of alimony."

Based upon the record presented in the instant case it appears that Trial Court's award of attorney fees to Ms. Gray was based solely up on its finding of fault on the part of Mr.Gray and there was no inquiry made as to Ms. Gray's financial need. We do not address the validity of the Court's findings regarding any fault on the part of Mr. Gray because even if such findings are valid they constitute an inadequate basis for the award of attorney fees as such an award is inappropriate absent a showing of need on the part of Ms. Gray. Inquiry was not made as to Ms. Gray's need and had such inquiry been made it would have shown that Ms. Gray should not receive attorney fees given the amount of property awarded her in this case.

Finally, Ms. Gray's request for attorney fees incurred by her in defense of this appeal is denied upon our finding that such is not justified under the circumstances presented.

For the foregoing reasons the judgment of the Circuit Court is affirmed in part and reversed in part and remanded for such further proceedings, if any, as may be necessary and for collection of costs below. Costs of appeal are adjudged equally to Roy William Gray and Nancy Jane Gray.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE