*781 OPINION
WRIGHT, Justice.
On July 29, 1998, appellant Thomas Daniel Rhodes .was convicted of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2014), and sentenced to mandatory life imprisonment, Minn.Stat. § 609.185(a); see also Minn.Stat. § 244,05, subd. 4 (1996). This is our fourth review of this case. See Rhodes v. State (Rhodes III), 735 N.W.2d 315 (Minn.2007); State v. Rhodes (Rhodes II), 657 N.W.2d 823 (Minn.2003); State v. Rhodes (Rhodes I), 627 N.W.2d 74 (Minn.2001). The present appeal arises from the summary denial of Rhodes’s third and fourth petitions, for postconviction relief. The issue presented in this appeal is whether the postconviction statute, of limitations, Minn.Stat.. § 590.01, subd. 4(a) (2014), bars these petitions. We hold that the postconviction court did not abuse its discretion by summarily denying relief because Rhodes’s petitions for post-conviction relief were untimely under the postconviction statute of limitations.
I.
On the night of August 2, 1996, Rhodes and his wife took a boat ride on Green Lake, near Spicer.[1] Rhodes returned to shore and told police that his wife accidentally fell overboard.. Approximately 13 hours later, his wife’s body was found floating near shore. The cause of her death was drowning. Following a police investigation, Rhodes was indicted by a grand jury for first- and second-degree murder. Rhodes pleaded not guilty and demanded a jury trial.
At trial, the State argued that Rhodes forced his wife overboard with a-blow to the neck, struck her with the boat multiple times, and subsequently lied to police' about the location of her drowning. Dr. Michael McGee, a medical expert for the State, testified in relevant part that the victim “received some type of trauma to the outer surface of the skin in the neck area ... with enough- force to cause breakage of blood vessels.” When asked if that external neck trauma could “have been done with a ‘hand, in particular a hand used ... in the V, position,” Dr. McGee replied, “I believe .that is possible, yes.” He also testified that the injuries on both sides of the victim’s face could have been caused by multiple strikes from, the hull of a boat. By contrast, defense expert Dr. Lindsey Thomas opined that the injuries to both sides of the victim’s face were caused by blood that had drained into her face from a forehead injury.
There was disagreement at trial among the experts regarding the drowning location and, specifically, when the victim’s body could have been expected to resurface given the lake conditions. Captain William Chandler testified that, if the victim’s body “had sunk in1 Minnesota lake water approximately 40 feet deep,” which was the depth of the drowning location on Green Lake that Rhodes reported to police, it would have taken “three to four weeks” for the victim’s body to resurface. Captain Ghandler testified- that, “starting about 30-feet on down, the-bottom temperature of any. Minnesota lake year round is about 39 degrees.” He explained that this cold temperature slows the decomposition rate of a drowned body, which lengthens the time period for a body to resurface. Defense expert Dale Morry testified that water temperature varies from lake to lake *782 depending on the depth of the lake,- the size of the lake, and the above-surface temperature, but “as a ‘rule of thumb’ a person who drowned in.40 feet of water would resurface in five to eight days.” The testimony from Captain Chandler and defense expert Morry supported the State’s theory that Rhodes lied about the location of the drowning, because the victim’s body was found floating near the shore approximately 13 hours after she allegedly fell overboard.
The jury found Rhodes guilty of first- and second-degreé' murder. Rhodes filed a direct appeal, which wé stayed to allow him time to file a postconviction petition. Rhodes I, 627 N.W.2d at 81. In his first postconviction petition, Rhodes asserted ah ineffective-assistance-of-counsel claim, alleging that his trial counsel failed to sufficiently cross-examine Dr. McGee and object to his testimony, and failed to present available medical evidence to counter Dr. McGee’s testimony. Rhodes also asserted a newly-discovered-evidence claim consisting of recent medical articles related to drowning forensics. Attached to his petition, Rhodes submitted an affidavit from Dr. John Plunket, a forensic pathologist. Dr. Plunket .opined that the internal hemorrhaging in the victim’s neck probably occurred “during the process of drowning and the struggle for survival.” Id. at 82. The postconviction court denied the petition without holding an evidentiary hearing. Id. at 83. Rhodes appealed. In Rhodes I, we consolidated Rhodes’s direct and postconviction appeals. We rejected Rhodes’s[1] evidentiary challenges, stayed the consolidated appeal, and remanded to the postconviction court for an evidentiary hearing to determine whether trial counsel’s performance was objectively unreasonable. Id. at 85-86, 88-89.
Drs. Wright, McGee, Thomas, and Plunket testified at the evidentiary hearing. Dr. Ronald Wright testified that the hemorrhaging in the victim’s neck could have been caused by some kind of pressure'to thé'throat but, equally as likely, could have been caused during the drowning process. Dr. McGee reaffirmed his trial testimony. And Drs. Thomas' and Plunket testified that based on their review of recent medical articles, they believed the hemorrhaging in the victim’s neck that occurred during the drowning process or postmortem was a result of hypostasis or a breaking of rigor mortis. The postconviction court subsequently denied Rhodes’s request for postconviction relief, concluding that the trial counsel’s performance was not objectively unreasonable and that the alleged newly discovered medical evidence did not warrant a new trial. We then vacated our stay of Rhodes’s consolidated appeal. Rhodes II, 657 N.W.2d at 839.
In Rhodes II, we held that the evidence was sufficient to support Rhodes’s conviction. The evidence included witnesses who saw a boat zigzagging and heard yelling from its occupants; inconsistencies in Rhodes’s statements; physical evidence that the victim’s body could not have sunk at the location marked by Rhodes and resurfaced in Í3 hours; the discovery of the victim’s body nine-tenths' of a mile from that location marked by Rhodes; motive evidence including life insurance proceeds, household debt, and Rhodes’s extramarital affair; and medical testimony that the victim’s head ’injuries were consistent with 'multiple strikes by a boat and her neck injuries were caused by external pressure. See Rhodes II, 657 N.W.2d at 829-32, 839-42.
Our decision in Rhodes II also affirmed the denial of Rhodes’s first postconviction petition. 657 N.W.2d at 846. We held that the performance by Rhodes’s trial counsel was not objectively unreasonable. *783 Id. at 843. We also concluded that even if the new medical literature offered by Rhodes “presented] ground-breaking research,” id. at 846, it failed to satisfy the fourth prong of the Rainer newly-discovered-evidence test, which requires a showing that the newly discovered evidence “will probably produce either an acquittal at a retrial or a result more favorable , to the petitioner.” Id. at 845 (quoting Race v. State, 417 N.W.2d 264, 266 (Minn.1987)); see Rainer v. State, 566 N.W.2d 692, 695 (Minn.1997). On this point, we concluded:
This allegedly newly available medical evidence does not diminish the circumstantial evidence heard and considered by the jury. There was sufficient evidence independent of the medical evidence, including physical-and motive evidence, testimony as to Rhodes’ conduct, and inconsistencies in -Rhodes’ statements, to conclude that [the victim’s] death was a premeditated homicide.... Rhodes has not established .... that [this evidence] would probably produce an acquittal or a result more favorable to. him on retrial.
Id. at 846 (emphasis added). Consequently, we held that “the postconviction court did not abuse its discretion in concluding that Rhodes is not entitled to a new trial on the grounds of newly discovered medical evidence.” Id.
Three years after his direct appeal was final, Rhodes filed -his second petition for postconviction relief. This petition alleged in part that he was entitled to a hew trial based on newly discovered evidence of lake conditions that purportedly explained why his- wife’s body was found almost nine-tenths of a mile from where he told searchers that he had last seen -her. The post-conviction court summarily denied the second petition, and we affirmed its decision. Rhodes III, 735 N.W.2d 315, 319 (Minn.2007). In doing so, we explained that “Rhodes ha[d] not shown that the information about the ‘uneven bottom’ of the lake was not available to-him or' his counsel during his trial or that his failure to learn of it before trial was not due to a lack of diligence.” Id. ' •
In 2007, shortly after we released our decision in Rhodes III, the 2-year statute of limitations for Rhodes to petition for postconviction relief expired. See Minn. Stat. § 590.01, subd. 4(a), (2014) (“No petition for postconviction relief may be filed more than two years after the later of: (1) the .entry of judgment of conviction or sentence if no .direct appeal is filed; or (2) an appellate court’s disposition of. petitioner’s direct, appeal,”); Act of June 2, 2005, ch. 136, art. 14, §. 13,.2005 Minn.-Laws 901, 1098 (providing that if a person’s conviction became final before the statute’s effective date of August 1, 2005,' that person has 2 years from that effective date to file a postconviction petition).[2]
On November 27, 2012, more than 5 years after .the limitations period had expired, Rhodes filed his third petition for postconviction relief. This petition alleged newly discovered evidence gathered by a private investigator and submitted to Rhodes 3 years before in a report dated September 29, 2009. The report contained *784 (1) maps-of Green Lake and GPS/Sonar data; (2) general descriptions of the effects of carbon'monoxide poisoning; (3) witness statements regarding the manner in which Rhodes returned to shore; and (4) witness statements regarding the victim’s head injuries. Rhodes received a supplemental ;;,one-page report from the private, investigator ,on October 19, 2Q10. As part of his third petition, Rhodes also alleged,-that the State committed discovery violations by failing .to disclose some of the evidence presented in the private .investigator’s reports. The posteonviction court summarily denied the third petition based on the dates of these' reports, concluding that Rhodes’s claims were untimely because they “arose” more than 2 years before thé petition’s filing date of November 27, 2012. ‘See Minn.Stat. § 590.01, subd. 4(c). The posteonviction court also concluded that the claims in Rhodes’s third petition failed on their merits. • Rhodes appealed the summary denial of his third petition. We stayed the appeal to allow Rhodes to file yet another posteonviction petition.
On March 21, 2014, almost 7 years after the statute of limitations had expired, Rhodes filed his fourth posteonviction petition, which' alleged two claims that are relevant here.[3] First, Rhodes alleges a newly-discovered-evidence claim, primarily based on scientific literature addressing drowning forensics and reports from experts applying that literature to this case The scientific literature addresses the causes of injuries and bodily changes-'in drowning cases, including neck hemorrhaging, postmortem lividity (gravity-dependent pooling of blood), body buoyancy, travel abrasions (injuries caused by scraping the lake bed or shore), and animal predation.[4] Rhodes relies most heavily on two scientific articles related to neck hemorrhaging, referred to here as Pollanen (2009) and Alexander & Jentzen (2011),[5] which allegedly establish changed scientific knowledge on the causes of neck hemorrhaging in drowning cases. Pollanen (2009) concluded that, when a dead body is angled downwards (a “head down position”),' hemorrhagic lividity of the soft tissue’ of the neck (extravascular rupture and leakage of blood vessels due to gravitational-pressure after death) may occur, causing “pseudo bruises” that may lead to “misidentification of violent neck injury.” Alexander & Jentzem (2011), a case study of a single drowned body, concluded that *785 hemorrhaging in the anterior neck muscles can be explained by elevated venous pressure and the rupture of congested blood vessels caused by reactions during drowning, such as coughing, gagging, vomiting, and abdominal contractions. According to Dr. Jentzen’s affidavit, Alexander & Jent-zen (2011) disproved the scientific community’s earlier belief that hemorrhages in the anterior neck muscles “do not occur in drowning and should always raise the suspicion of foul play.” After'reviewing Dr. McGee’s autopsy report, Dr." Jentzen opined that “the hemorrhage in [the victim’s] neck could have occurred during the drowning process or postmortem, as- opposed to pre-mortem external-pressure.” (Emphasis added.)
After reviewing Pollanen (20Ó9), Alexander & Jentzen (2011), and the expert affidavits offered by Rhodes, Dr. McGee signed an affidavit, dated July 2, 2014, stating that he still believed “the opinions and conclusions in the testimony I provided at trial and postconviction evidentiary hearing were , correct as related to the death of [the victim].” Dr. McGee asserted that, .unlike the. hemorrhaging in the victim’s neck, the hemorrhaging described in the Alexander & Jentzen study .was “confined to the fascial surfaces of the muscle.” Moreover, Dr. McGee asserted that Rhodes’s experts had looked at each of his “findings in isolation and misinterpreted both the nature and cause of each finding.”
Second, Rhodes alleges a false-testimony claim based on a 2006 lake survey report conducted by the Minnesota Department of Natural Resources (DNR). This DNR report allegedly establishes that the State’s witness, Captain Chandler, testified incorrectly at trial regarding the temperature of Green Lake on the night of the drowning. According to the DNR report, the temperature of Green Lake in August 1996, at a- depth of 40 feet, was 68.9 degrees, whereas Captain Chandler testified that the lake temperature at that depth was 39 degrees. Although the State concedes the lake’s higher temperature would have reduced the resurfacing time of the victim’s body from 4 weeks to 1 week, it contends that this evidence is immaterial because it would not have impacted the State’s theory of the case. At trial, the State argued that Rhodes lied about the location of the drowning because Captain Chandler and defense, expert Morry both agreed that; if the drowning had occurred at the location indicated by Rhodes, the victim’s body would not have resurfaced 13 hours later. Consequently, the State contends that, even if the resurface time at the location indicated by Rhodes was only 1 week, the victim plainly did not drown at that location because her body resurfaced 13 hours later.
The postconvictibn court summarily denied the fourth petition, concluding that Rhodes failed to satisfy the newly-discovered-evidence exception to the statute of limitations. Minn.Stat. §.590.01, subd. 4(b)(2) (2014). ’' This exception allows a court to hear an untimely petition for post-conviction relief when
the petitioner alleges the existence of newly discovered evidence, including scientific evidence, that could not have been ascertained by the exercise of due diligence by the petitioner or petitioner’s attorney within the two-year time period for filing a postconviction petition, and the evidence is not cumulative to evidence presented at trial, is not for impeachment purposes, and establishes by a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted.
Id. The postconviction court explained that, “even if the Court were to accept as *786 true everything contained within the recent scientific literature cited by [Rhodes] and the opinions offered by [Rhodes’s] forensic pathologists,” the proffered evidence did “not prove by clear and convincing evidence that [Rhodes] is innocent.” Rather, the literature and expert opinions simply support the general proposition that the victim’s injuries “may have been caused by ... the natural drowning process.” (Emphasis added.)
Regarding the DNR report on the water temperature of Green Lake, the postcon-viction court concluded that Rhodes failed to satisfy the “due diligence” requirement of the newly-discovered-evidence exception, Minn.Stat. § 590.01, subd. 4(b)(2). The court found that, because the DNR report was published in 2006 and the data in the report was publicly available as early as 1997, the report could have been discovered with due diligence before the 2-year statute of limitations expired in 2007. The postconviction court concluded, alternatively, that the water-temperature claim failed on its merits for two reasons. First, the State filed a posttrial affidavit in which Captain Chandler opined that, regardless of whether the water témperature at 40 feet was 39 degrees (several weeks to resurface) or 68.9 degrees (approximately one week to resurface), the victim’s body could not have resurfaced within 13 hours if she had drowned at' the location marked by Rhodes. Second, defense expert Morry testified at trial that if ’ an individual drowns in 40 feet of water, it would take at least 5 days for the drowned body to resurface. The postconvictiori court concluded, therefore, that even if Captain Chandler had not testified to an incorrect water temperature, the outcome of the trial would have been the same because the jury would ’ have heard testimony'* from both the State and the defense that the minimum resurfacing time at 40 feet is at least 5 days, which is far longer than the actual 13-hour resurfacing time of the victim.
Rhodes appealed the denial of his fourth postconviction petition. We vacated our stay of the appeal of his third postconviction petition, and this consolidated appeal followed.
II.
We review a denial of a petition for postconviction- relief, as well as the denial of an evidentiary hearing, for an abuse of discretion. Riley v. State, 819 N.W.2d 162, 167 (Minn.2012). A postcon-viction court does not abuse its discretion unless it has “exercised its discretion in an arbitrary or capricious manner, based its ruling on an erroneous view of the law, or made clearly erroneous factual findings.” Brown v. State, 863 N.W.2d 781, 786 (Minn.2015). We review the postconviction court’s legal conclusions de novo and its findings of fact for clear error. Greer v. State, 836 N.W.2d 520, 522 (Minn.2013).
 An evidentiary hearing on a petition is required when there are' material facts in dispute that were not resolved at trial and must be resolved to rule on the merits of the issues raised. Riley,' 819 N.W.2d at 167. The legal standard required to obtain an evidentiary hearing “is lower than that required for a new trial.” Bobo v. State, 820 N.W.2d 511, 516 (Minn.2012). Any doubts about whether to conduct an evidentiary hearing are resolved in favor of the petitioner. Id. But a post-conviction evidentiary hearing is not required when the petitioner alleges facts that, if true, are legally insufficient to grant the requested relief. Id.; see also Minn.Stat. § 590.04, subd. 1 (directing a court to hold an evidentiary hearing “[u]m less the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief’). *787 Accordingly, a posteonviction court may summarily deny an untimely claim. Minn. Stat. § 590.01, subd. 4 (2014); Colbert v. State, 870 N.W.2d 616, 622 (Minn.2015).
III.
We first address Rhodes’s third posteonviction petition. Here, we consider whether the posteonviction court abused its discretion by determining that the third petition was untimely under Minn.Stat. § 590.01, subd. 4. Although there are five exceptions to the statute of limitations, Minn.Stat. § 590.01, subd. 4(b), a petitioner has a limited period of time in which to invoke these exceptions. “Any petition invoking an exception ... must be filed within two years of the date the claim arises.” Id., subd. 4(c) (emphasis added). A claim arises under subdivision 4(c) when “the petitioner knew or should have known that he had a claim.” Sanchez v. State, 816 N.W.2d 550, 560 (Minn.2012). When a petition for posteonviction relief is filed more than 2 years after the claim arose under subdivision 4(e), a posteonviction court does not abuse its discretion when it summarily denies the petition. Greer, 836 N.W.2d at 523; Wayne v. State, 832 N.W.2d 831, 834 (Minn.2013); McDonough v. State, 827 N.W.2d 423, 427 (Minn.2013); Colbert, 811 N.W.2d at 105-06.
Rhodes filed his third petition for posteonviction relief on November 27, 2012. His claim under the newly-discovered-evidence exception, Minn.Stat. § 590.01, subd. 4(b), was based on two reports, dated September 29, 2009 and October 19, 2010, respectively, which Rhodes received from a private investigator. The dates of the reports conclusively establish that Rhodes “knew or should have[1] known” of the claims raised in his third petition more than 2 years before he filed -his third post-conviction petition; ' See Sanchez, 816 N.W.2d at 560. The posteonviction court, therefore,' did not abuse its discretion by determining that Rhodes’s third petition was untimely under subdivision 4(e).
IV.
Turning to Rhodes’s fourth posteonviction petition, the issue presented is whether the posteonviction court abused its discretion when it determined that this petition was untimely under the posteon-viction statute of limitations.
It is undisputed that' Rhodes filed his fourth posteonviction petition nearly 7 years after the ’expiration of the posteonviction statute' of limitations.[6] Consequently, he is not entitled to relief unless he can establish one of the five exceptions set forth in Minn.Stat; § 590.01, subd. 4(b). Rhodes relies' exclusively on the newly-diseovered-evidence exception.[7] To establish that this exception applies, Rhodes must allege
newly discovered evidence, including scientific evidence, that could not have been ascertained, by the exercise of due diligence by petitioner' or petitioner’s attorney within the two-year time period for filing a posteonviction petition, and the evidence is not cumulative to evidence presented at trial, is not for impeachment purposes, and' establishes by *788 a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted.,. ,
Minn.Stat. § 590.01, subd. 4(b)(2) (emphasis added). The clear-and-eonvincing-inno-cence requirement in subdivision 4(b)(2) is more stringent than the newly-discovered-evidence test that applies to timely petitions, which, we applied in rejecting Rhodes’s similar claim of newly discovered medical evidence in Rhodes II, 657 N.W.2d at 845-46. The innocence prong that we apply here requires more than mere “uncertainty” about a petitioner’s guilt. Brown v. State; 863 N.W.2d 781, 787 (Minn.2015). Under the clear and convincing standard, the proffered evidence must be unequivocal,- intrinsically probable, and free from frailties. Gassier v. State, 787 N.W.2d 575, 583 (Minn.2010).
We conclude that, even if the scientific evidence alleged in Rhodes’s fourth petition were, proven to be true at an evidentiary hearing, it would not satisfy the innocence prong of the newly-discovered-evidence exception.[8] This is because the scientific evidence does not establish “by a clear and convincing standard that [Rhodes] is innocent.”[9] Minn.Stat. § 590.01, subd. 4(b)(2). Rhodes’s fourth petition relies heavily on Pollanen (2009) and Alexander & Jentzen (2011), which he alleges establish changed scientific knowledge on the causes of neck hemorrhaging in drowning cases since he was convicted. Pollanen (2009) concluded that, in cases in which a dead body rests in a downward angle, or a “head down position,” hemorrhagic lividity of the soft tissue of the neck may cause “pseudo bruises” that result in a “misidéntification of violent neck injury.” Alexander & Jentzen (2011) concluded that hemorrhaging in the anterior neck muscles can be explained by elevated venous pressure caused by drowning-related bodily reactions. According to Dr. Jentzen’s affidavit, Alexander & Jentzen (2011) disproved the scientific community’s earlier' belief that hemorrhages in the anterior neck muscles “do not occur in drowning and should always raise the suspicion of foul play.”
This scientific evidence, however, does not establish that Dr. McGee’s trial testimony was incorrect. Dr. McGee did not testify that neck hemorrhages never occur naturally during the drowning process. Rather, he testified that he believed the victim “received some type of trauma to the outer surface of the skin in the neck *789 area ... with enough force to cause breakage of blood vessels.” When asked whether that external-neck trauma could.“have been done with a hand, in particular a hand used ... in the V position,” Dr. McGee replied, “I believe that is possible, yes.” After reviewing Dr. McGee’s autopsy report, Dr. Jentzen did not opine that the victim’s neck injuries were caused by the drowning process. Instead, he opined that “the hemorrhage in [the victim’s], neck could have occurred during the drowning process or postmortem, as opposed to pré-mortem external pressure.” (Emphasis added.) . The opinion of another ’ expert .hired by Rhodes to support his petition, Dr. Rao, included similar equivocation. She stated: “Recent scientific literature supports my conclusion that the hemorrhages in [the victim’s] neck could be attributable to something other than external pressure.”[10] (Emphasis added.) Thus, even' if this scientific theory were proven at a hearing, it would not establish by clear and convincing evidence that Rhodes is innocent. Put differently, that the victim’s internal neck hemorrhages “could” have ' been caused by ' natural drowning processes does not unequivocally establish that Rhodes did not kill his wife. The.alleged scientific evidence is thus legally insufficient to entitle Rhodes to relief under the newly-discovered-evidence- exception.[11] The innocence prong of subdivision 4(b)(2) requires “more than uncertainty” about Rhodes’s guilt. Brown, 863 N.W.2d at 787.
Finally, even if we assume that the alleged scientific evidence fully refutes Dr. McGee’s medical testimony, that assumption is legally insufficient to establish the innocence prong because, as we held in Rhodes II, Rhodes’s murder conviction is independently supported by nonmedical (i.e., nonsciéntific) evidence. 657 N.W.2d at 846. In Rhodes II, we asshmed that the newly discovered medical evidence was “based on ground-breaking research.” Id. And we held that, even under the less stringent Rainer test, Rhodes was not entitled to relief based' on the newly discovered medical evidence, including literature on “hémorrhage in' the neck and other postmortem changes in drowning cases” because “sufficient evidence independent of the medical ' evidence ” supported Rhodes’s convictibn. Id. (emphasis add *790 ed). The nonmedical evidence included “physical and motive evidence, testimony as to Rhodes’ conduct, and inconsistencies in Rhodes’ statements.” Id. Our legal determinations in Rhodes II apply with equal force here.[12] ' Even if Rhodes presented groundbreaking scientific conclusions on the causes of the victim’s neck injuries, and even if Dr, McGee’s testimony .were erroneous under present science, this could not overcome our legal determination in Rhodes II that Rhodes’s conviction was independently supported by nonscientific evidence. Cf. Gassier v. State, 787 N.W.2d 575, 583 (Minn.2010) (holding that despite the admission of unreliable ballistics science,, the petitioner was not entitled to relief because other evidence supported his conviction). , Because the evidence proffered by Rhodes, even if true, conclusively fails to establish the innocence prong, under Minn.Stat. § 590.01, subd. 4(b)(2), the postconviction court did not abuse its discretion by summarily denying Rhodes’s claim of newly discovered scientific evidence.
The dissent contends that the factual dispute between Dr. McGee and Rhodes’s experts is “material,” and therefore an evi-dentiary hearing is required. To support this contention, the dissent relies on the fact that, at Rhodes’s postconviction hearing in 2001, one expert opined that Dr. McGee’s medical testimony was “the most paramount of the entire trial.” Infra at D-4 n. 2. However, we rejected implicitly any assertion that Dr. McGee’s testimony was “paramount to the entire trial” in Rhodes II, when we held that independent of Dr. McGee’s medical testimony, tíie nonmedical evidence supports the jury’s finding that the victim’s death was a premeditated homicide. 657 N.W.2d at 846. The dissent’s attempt to rewrite Rhodes II is unavailing. This is especially so when, as here, the dissent relies on the opinion of a defense expert that predates our decision in Rhodes II. Despite the dissent’s assertion to the contrary, any factual dispute between Dr. McGee’s testimony and the scientific literature .and expert opinions proffered in support of Rhodes’s fourth petition is not “material.” This is because, as. we held in Rhodes II, a reasonable jury could rely solely on the nonmedical evidence and find beyond a reasonable doubt that Rhodes committed a premeditated homicide.[13]
*791 Apart from scientific literature, Rhodes also • presents a Minnesota DNR report that establishes that the temperature of Green Lake in August 1996, at a- depth of 40 feet, was about 68.9 degrees Fahrenheit, rather than 39 degrees as Captain Chandler testified. The postconviction court concluded that the production of the DNR report faded to satisfy the “due diligence” requirement of the newly-discovered-evidence exception, Minn.Stat. § 590.01, subd. 4(b)(2). The postconviction court determined that this report, which included data available as early, as 1997, could have been discovered with due diligence before the 2-year postconviction statute of limitations expired in 2007, because the report was published in 2006. The postconviction court alternatively concluded that the water-temperature claim failed on its merits because the victim’s body would not have resurfaced within 13 hours, even if the water temperature was 68.9 degrees at a depth of 40 feet.
Because the DNR report is legally insufficient to establish the innocence prong of Minn.Stat. § 590.01, subd. 4(b)(2), we need not decide whether the due diligence requirement is satisfied. Even if Captain Chandler had provided, incorrect testimony on water temperatures and a 3-to-4 week resurfacing time, the jury still heard defense expert Merry’s testimony that a drowned body at a 40-foot depth takes at least 5 days to resurface. Moreover, Captain Chandler filed a posttrial affidavit stating that, even in light of the 68.9-degree temperature from the DNR report, it “still would have taken approximately one week for [the victim’s], body to refloat” from a 40-foot depth. Rhodes has not offered any evidence that defense .expert Morry has changed his opinion on a 5-day minimum resurfacing period based on the warmer temperatures included in the DNR report. Therefore, even if an evi-dentiary hearing were held, the State’s theory that Rhodes lied about the drowning location — that he say? the victim fall overboard at a 40-foot depth — would remain unaffected because, there is no evidence that a 13-hour resurfacing time is possible from that depth, regardless of the water temperature. In sum, Rhodes has not raised a material factual dispute that would establish his innocence under a clear and convincing standard. Accordingly, the DNR report is legally, insufficient to entitle Rhodes to posteonviction relief or an evi-dentiary hearing...
y.
The record conclusively establishes that Rhodes knew or should have.known of the claims raised in his third postconviction petition before November 27,2010 (2 years before he filed his third postconviction petition). Therefore,,his third petition is untimely under the 2-year statute of limitations : provided by Minn.Stat, § 590.01, subd. -4(c). Also, even if the alleged evidence in support , of his fourth postconviction petition were proven to be true at an evidentiary hearing, this evidence would fail to establish by a clear and convincing standard.that Rhodes is innocent. Therefore, his fourth petition is untimely under the newly-discovered-evidence exception, Minn.Stat. § 590.01, subd. 4(b)(2). Accordingly, we affirm the postconviction court’s denial of Rhodes’s third and fourth petitions as untimely under the postconviction statute of limitations.
Affirmed.
*792 HUDSON, J., not having been a member of this court at the time of submission, took no part in the. consideration or decision of this case..

. We limit our discussion of the facts and evidence to those aspects of the case that are directly, relevant to this appeal. More detailed descriptions of the underlying facts and evidence are. set forth in Rhodes I, 627 N,W.2d at 77-81, and Rhodes II, 657 N.W.2d at 828-32.

. The Legislature enacted this statute of limitations in response to a dramatic increase in the number of postconviction petitions, many of which involved old claims brought years after a conviction was affirmed on direct appeal. See Hearing on H.F. 2630, H. Judiciary Policy & Fin. Comm., 83d Minn. Leg., Mar. 10, 2004 (audio tape). Minnesota’s 2-year statute of limitations is twice as long as the 1-year statute of limitations for bringing federal habeas corpus claims. See 28 U.S.C. § 2244(d)(1) (2012) (“A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.”).

, Although. Rhodes raised an ineffective-assistance-of-counsel claim in his fourth petition, he failed to address it in his brief to this court. As a result, that issue is forfeited. Powers v. State, 688 N.W.2d 559, 560 n. 1 (Minn.2004). ' Moreover, the same issue was raised and decided ip Rhodes II, 657 N.W.2d at 843.

. We address the evidence presented in the fourth petition related to body buoyancy, travel abrasions, and animal predation only to conclude that tire posteonviction court did not abuse ‘its discretion when it determined that this evidence was either cumulative or Knaff-la-barred because ifwas presented at trial, in previous posteonviction proceedings, or on Rhodes’s direct appeal. Rhodes II, 657 N,W;2d at 832-35; see Minn.Stat. § 590.01, subd, 4(b)(2) (requiring that newly discovered evidence be "not cumulative to evidence presented at trial"); Leake v. State, 737 N.W.2d 531, 535 (Minn.2007) (providing that if a claim was “raised,” "known,” or "should have been known” on direct appeal, that claim "will not be considered in a subsequent petition for posteonviction relief” (citing State v. Knaffla, 309 Minn. 246, 243 N.W.2d 737 (1976))).

. Russell T. Alexander & Jeffrey M. Jentzen, Neck and Scleral Hemorrhage in Drowning, 56 J. Forensic Sci. 522 (Mar.2011) [hereinafter Alexander & Jentzen (2011) ]; Michael S. Pollanen, et al., Hemorrhagic Lividity of the Neck: Controlled Induction of Postmortem Hypostatic Hemofrhages, 30 Am. J. Forensic Med. & Pathology 322 (Déc. 2009) [hereinafter Pol-lanen (2009) ].

. Because Rhodes’s conviction became final before August 1, 2005, the effective date of the statute of limitations, Rhodes had two years after that effective date to file a posteonviction petition. Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1098. Rhodes filed his fourth petition on March 21, 2014.

. Rhodes’s petition also raised the “interests of justice" exception, Minn.Stat. § 590.01, subd. 4(b)(5), but this issue is forfeited because it was not- argued in Rhodes’s brief to this court. Wayne v. State, 860 N.W.2d 702, 704 & n. 2 (Minn.201-5).

. Although our analysis focuses on Rhodes’s failure to satisfy the innocence prong, we observe that the affidavits of Rhodes's experts are being offered to impeach Dr. McGee’s trial testimony. ,To satisfy the newly-discovered-evidence exception, however, the new evidence must not be offered "for .impeachment purposes.” Minn.Stat. § 590.01, subd. 4(b)(2). Moreover, we have held that "generally, expert testimony does not constitute newly discovered evidence justifying a new trial” because "if discovery of a tenth expert is new evidence warranting a new trial, no verdict would ever be final.” State v. Blasus, 445 N.W.2d 535, 543 (Minn.1989).

. Rhodes also argues that the publication date of the scientific literature is not the date his claim "arises" under Minn.Stat. § 590.01, subd. 4(c), because, he contends, for "shifted science,” the publication date of an article does not determine the date on which science changed. .This is so, he maintains, because scientific knowledge evolves "gradually” through multiple experts and articles in the community. With this argument, Rhodes invites us to adopt a novel "shifted science” rule, in which the accrual date under subdivision 4(c) depends on the date that new scientific knowledge becomes generally accepted. We decline to address the merits of this proposed "shifted science” rule because, even if subdivision 4(c) were satisfied, Rhodes's petition still would be legally insufficient to meet the innocence requirement under Minn.Stat. § 590.01, subd. 4(b)(2).

. Other experts hired by Rhodes were somewhat less equivocal in their application of this science (Alexander & Jentzen 2011; Pollanen 2009) to the victim's neck hemorrhages. Dr. Bruce Hyma stated that neck hemorrhages "can occur" during the drowning process and that "[t]he hemorrhages in the neck do not appear to have been caused by external pressure.” Dr. Carl Wigren stated that the victim's neck hemorrhages were "likely explained" by the processes proposed by Alexander & Jentzen (2011) and Pollanen (2009) and that the type of hemorrhage in the victim's neck is "not associated with blunt force injury." Even if we consider these opinions as true, arid if wé assume that they are not merely impeaching of Dr. McGee’s trial testimony, see Minn.Stat. § 590.01, subd. 4(b)(2), they still would not alter our conclusion that Rhodes cannot establish the innocence prong because there is sufficient nonsciéntific evidence supporting Rhodes’s guilt, see Rhodes II, 657 N.W.2d at 846, as discussed below.

. This is true even under the legal standard articulated by the dissent, which simply requires a defendant to prove ,by clear and .convincing evidence that "no reasonable-jury would,have found proof of guilt beyond a reasonable doubt.” Infra at D.2. That the victim’s neck hemorrhages "could” have been caused by natural drowning processes does not preclude a reasonable jury from considering the totality of the evidence presented and .. finding proof of guilt beyond a reasonable doubt, . Unlike the dissent's hypothetical DNA evidence, infra at D-10, the fact that the victim’s internal ,neck hemorrhages "could” have been caused by the natural drowning process does not meet the dissent’s hypotheti- . cal "99.99% probability” that Rhodes did not kill his wife.

. The dissent contends that we must reassess the nonmedical evidence because Rhodes has offered purportedly new and compelling scientific evidence. Infra at D-ll. We disagree. There has been no change'in the nonmedical facts, including- the fact that the victim could not have drowned at the location identified by Rhodes because her body resurfaced 13 hours ' later. In Rhodes II, we removed Dr. McGee's testimony from the analytical equation and still concluded that there was sufficient evidence to find that the victim’s death was a premeditated homicide. Even if we assume that there are now more compelling reásons to remove Dr. McGee's testimony from the equation/ that does not change Rhodes II's conclusion that the nonmedical facts independently support the jury's finding that the victim’s death was a premeditated homicide.

. The dissent also contends that 'a remand for an' evidentiary hearing is required because the postconviction court applied the wrong legal standard for granting an evidentiary hearing. Infra at D-7. In its order, the post-conviction court stated, "In light of the contradicting testimony presented, by equally qualified forensic pathologists, the Court cannot conclude that the scientific literature and expert opinions offered by [Rhodes] (even if true) make it highly probable that [Rhodes] is innocent.” This statement, the dissent contends, demonstrates that the postconviction court failed to consider the facts alleged in the petition in a light most favorable to the petition. Riley, 819 N.W.2d at 167. However, a remand for an evidentiary hearing is not warranted. As we conclude above, any factual dispute between Dr. McGee and Rhodes's experts is not “material” because, as we held in Rhodes II, 657 N.W.2d at 846," a reasonable *791 jury could find Rhodes guilty of premeditated homicide based solely on the nonmedical' evidence.

. The '.‘actual innocence” rule from Brown, 863 N.W.2d at 787-88, and Riley, 819 N.W.2d at 170, uses the language "no reasonable jury would convict,” but it is helpful to unpack the word “convict” and place it within the well-established standard for' conviction,' “proof ‘ beyond a reasonable doubt.” E.g., State v. Peterson, 673 N.W.2d 482, 486 (Minn.2004) ("[T]he Due Process Clause requires the state to prove every element of a charged offense beyond a reasonable doubt.”) (citing In re Winship, 397 U.S, 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)).